# WASHINGTON SOUTHERN RAILWAY COMPANY *v.* SMITH.

---

RAILROADS; PROXIMATE CAUSE; NEGLIGENCE; EMPLOYERS' LIABILITY ACT; MASTER AND SERVANT.

1. Where a rule of a railroad company requires the movement of engines

Note.—For an elaborate review of the cases on the constitutionality, application, and effect of the Federal employers' liability act, see note in 47 L.R.A.(N.S.) 38, and supplementary note in L.R.A.1915C, 47.

at the point of coupling at a speed not exceeding 2 miles an hour, the movement of an engine in violation of the rule will not entitle a brakeman injured in making a coupling to recover damages from the railroad company, unless it appears that the speed of the engine contributed to the accident.

2. Where a brakeman was injured in making a coupling, negligence on the part of the railroad company, in an action by the brakeman against it, cannot be predicated upon the failure of a conductor working with him to signal the engine to stop, where there was nothing in the position of the brakeman, or any unusual condition or situation of the cars, to indicate to the conductor that he should give such a signal, and the brakeman did not expect the conductor to stop the engine before making the coupling, and it was not the custom to do so.    (Mr. Justice Robb dissenting on the facts.)

3. The common-law rule of negligence is not modified by the employers' liability act of Congress of 1908 (35 Stat. at L. 65, chap. 149), but by that act it was the intention of Congress to base the action upon negligence only, and to exclude responsibility of the carrier to its employees for defects and insufficiencies not attributable to negligence; and the common-law rule as to burden of proof remains unmodified by the statute.

4. Assumption of risk is only eliminated as a defense in cases coming under sec. 4 of the employers' liability act of Congress, where the violation by a carrier of any statute enacted for the safety of employees contributes to the injury or death of such employee; otherwise the defense of assumption of risk remains as at common law.

5. When a servant, in the execution of his master's business, receives an injury which befalls him from one of the risks incident to the business, he cannot hold the master responsible, but must bear the consequences himself; and this rule applies to railroad brakemen, who assume the risk of their calling.

6. Negligence on the part of a railroad company resulting in an injury to a brakeman in its employ while he was making a coupling of cars cannot be predicated upon the fact that there was a curve of the track at the point where the coupling was being made.

No. 2851.    Submitted December 9, 1915.    Decided May 1, 1916.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action to recover damages for personal injuries.    *Reversed.*

The COURT in the opinion stated the facts as follows:

This appeal is from a judgment on verdict of the supreme court of the District of Columbia against appellant, Washington Southern Railway Company, defendant below, in an action to recover damages for personal injuries sustained by plaintiff, Oliver H. Smith, a brakeman in the employ of defendant company, while engaged in coupling a car to an engine in the Potomac yard, near Alexandria, Virginia.

The declaration contained two counts, the first brought under the employers' liability act of 1908. (35 Stat. at L. 65, chap. 149, Comp. Stat. 1913, § 8657) and the second alleging a violation of the safety appliance act, approved March 2, 1893 (27 Stat. at L. 531, chap. 196, Comp. Stat. 1913, § 8605), as amended by the act of 1903 (32 Stat. at L. 943, chap. 976, Comp. Stat. 1913, § 8613). The trial court held that the evidence was insufficient to support the allegations of the second count of the declaration, and directed a verdict thereon for defendant. The case went to the jury upon the first count.

In stating the facts from the bill of exceptions, we will rely entirely upon the testimony of plaintiff, since defendant offered no evidence, electing to stand upon its motion for an instructed verdict.

Plaintiff was about thirty years old at the time of the accident. He had been in the employ of defendant company about one year and a half or two years as an extra brakeman in the Potomac yard. His duties included moving, coupling, and uncoupling cars. On the afternoon of the accident, plaintiff was engaged with a switching crew in making up a freight train in the yard. The Potomac yard contains about eighty tracks used in making up trains. These tracks, known as "classification" tracks, branch off from the main or what is known as the "ladder" track.

The coupling device in use on this occasion and its operation are concisely described in the brief of counsel for defendant, as follows: "In describing the accident the plaintiff used the word 'drawhead' to mean the entire coupler, which weighs about

300 pounds and has more or less lateral play or motion in the sleeve or hanger in which it rests. The 'knuckle' is the portion of the coupler which is movable and opens when the cars are uncoupled, and which closes and is held fast by the latch pin when the cars are coupled. The 'cut lever' is a bar of iron which extends from a coupler to each side of the car, so that a brakeman standing at either side of the car may raise the latch pin and open the knuckle by turning the handle of the cut lever, and thus permit the cars to uncouple without the necessity of going between the ends of the cars for the purpose of raising the latch pin by hand."

The accident occurred while plaintiff was in the act of making a coupling between an oil-tank car and the tender attached to a road engine with which the switching was being done. As the engine was backing from the main track on to track 25 for the purpose of connecting with the oil-tank car, plaintiff stepped on to the track and adjusted the knuckles and drawhead of the tank car to receive the tender coupling. He then walked up the track 8 or 10 feet, and met the approaching engine. He stepped on the rear footboard of the tender for the purpose of adjusting the coupling thereon. While in that position he reached down and opened the knuckles on the drawhead. Standing with his left foot on the footboard, and holding to the grab-iron, he used his right foot to push the drawhead over into position to make the coupling. This shifting of the drawhead from its normal position became necessary from the fact that there was a curve in the track at this point. At the moment of making the coupling, his foot slipped from the drawhead and was caught in the knuckles. While there is no direct testimony that a coupling was made, it must be assumed from the testimony of plaintiff, who states that when his foot was caught he "pulled the cut-lever" and the "couplers came apart," releasing his foot.

Plaintiff's statement of how the accident happened is as follows:

Q. Go ahead and tell what else you did.

A. I put my foot up to shove it (drawhead) over, and the engine came back against the car and my foot got in between the couplers. My foot slipped just before they came together. * * *

Q. Exactly what happened when you did that? You were on the engine?

A. Yes, sir. The engine was coming back.

Q. And you put your right foot up against that thing that way (illustrating)?

A. Yes, sir, to shove it over. When I seen the cars coming back I went to get my balance. I was leaning back shoving over hard on it, and I went to get my balance, and I don't know just how it happened. I know my foot got in there. * * *

Q. You were standing on the back end of that engine, with both knuckles opened, endeavoring to push over the side of the knuckle with your right foot?

A. Yes, sir.

Q. Attempting to strike it here?

A. No, sir; I put it up there (illustrating). I had it up there (illustrating), and was leaning back shoving at the time.

Q. And your foot slipped?

A. When I went to get my balance—I seen the cars coming back, and there was more or less jar of the impact, and I went to pull myself up there and it got in there between the two cars where the couplings come together. I don't know whether it was between the other two knuckles or not. The other knuckle might have caught, too.

On the question of the negligence of defendant, plaintiff testified that, when he stepped on the footboard 8 or 10 feet from the tank car, the engine was moving at the rate of 4 miles per hour, and that the rule of the company required a rate in making couplings of not to exceed 2 miles per hour. His testimony is further detailed in the record as follows: "Conductor Laycock was standing directly behind plaintiff, possibly 6 or 8 feet away, and he was in a position to see everything that was going on and to pass signals; plaintiff

relied upon him to give signals in this case, as they always did when two of them worked together; plaintiff was standing on the step which runs across the back of the engine; by 'engine' he means the tender, the step that runs across the back of the tender, on the right side, engineer's side, and was in plain view of conductor Laycock, but was not in view of the engineer, Harrington, until he leaned back when he was shoving the coupling over, when his head and shoulders would extend and the engineer could see him; when a man is between the cars we always rely on the man on the ground to give the signals to slow up, and 'according to the rapidity of the movement of his hand the engineer understands whether he is to slack his speed or to stop;' plaintiff was not in a position to give a signal to the engineer—as to whether or not it was ready for a coupling to be made because he was adjusting the drawhead; at the time the cars came in contact plaintiff was shoving the drawhead over and making the adjustment of the coupler so that they would make; plaintiff had not given any signal that everything was in readiness for a coupling to be made; everything was not in readiness for a coupling to be made in the respect that 'I was not prepared for the contact between the cars, as I was not in a position where it was safe. I would easily overbalance. I did not realize the proximity of the car at the time, to the engine tender.' "

At the close of plaintiff's evidence, defendant moved the court for an instructed verdict. As stated, the court granted the motion as to the second count of the declaration, but denied the motion as to the first count, to which defendant excepted. Defendant, standing upon its exception, offered no testimony. The case was submitted to the jury upon instructions, and a verdict was returned for plaintiff. From the judgment thereon this appeal was taken.

*Mr. Frederic D. McKenney, Mr. John S. Flannery,* and *Mr. G. Bowdoin Craighill,* for the appellant, in their brief cited:

*Butler* v. *Frazee,* 211 U. S. 459; *Delk* v. *St. Louis & S. F. R.*

*R.* 220 U. S. 580; *Duvall* v. *P., B. & W. R. R.* 43 Wash. Law Rep. 226; *El Paso & N. E. Ry.* v. *Gutierrez,* 215 U. S. 87; *Employers' Liability Cases,* 207 U. S. 463; *Gila Valley, etc., Ry.* v. *Hall,* 232 U. S. 94; *Grand Trunk Ry. Co.* v. *Lindsay,* 233 U. S. 42; *Hyde* v. *Southern Ry. Co.* 31 App. D. C. 466; *Kohn* v. *McNulta,* 147 U. S. 238; *Norfolk & W. Ry.* v. *Earnest,* 229 U. S. 114; *Northern Central Ry.* v. *Medairy,* 86 Md. 168; *Northern Pac. Ry.* v. *Freeman,* 174 U. S. 379; *Patton* v. *Ry. Co.,* 179 U. S. 658; *Reidel* v. *P. W. & B. R. R.* 87 Md. 153; *Schlemmer* v. *Buffalo, etc. Ry.* 205 U. S. 1; *Schlemmer* v. *Buffalo, etc. Ry.* 220 U. S. 590; *Seaboard Air Line Ry.* v. *Horton,* 233 U. S. 492; *Seaboard Air Line Ry.* v. *Tilghman,* 237 U. S. 499; *Second Employers' Liability Cases,* 223 U. S. 1; *Southern Pac. Co.* v. *Seley,* 152 U. S. 145; *Southern Ry. Co.* v. *Crockett,* 234 U. S. 725; *Texas & Pac. Ry.* v. *Harvey,* 228 U. S. 319; *Thompson-Starrett Co.* v. *Warren,* 38 App. D. C. 310; *Toledo, etc. R. R.* v. *Slavin,* 236 U. S. 454; *Tuttle* v. *Detroit, etc. Ry.* 122 U. S. 189; *Washington & G. R. R.* v. *McDade,* 135 U. S. 554; *Yazoo & Miss. V. R. R.* v. *Wright,* 235 U. S. 376.

*Mr. James S. Easby-Smith* and *Mr. Ralph B. Fleharty,* for the appellee, in their brief cited:

*City & Sub. Ry. Co.* v. *Cooper,* 32 App. D. C. 550; *McDermott* v. *Severe,* 202 U. S. 608–614; *Richmond & Danville R. Co.* v. *Powers,* 149 U. S. 43; *T. P. Ry. Co.* v. *Behymer,* 189 U. S. 468; *Schlemmer* v. *Buffalo R. Co.* 205 U. S. 1; *Grand Trunk Ry. Co.* v. *Lindsay,* 233 U. S. 42; 26 Cyc. 1477; 26 Cyc. 1478; *Duvall* v. *Phila., B. & W. R. Co.* 43 Wash. L. Rep. 226, 43 App. D. C.;— *Chicago, etc. R. Co.* v. *Brown,* 229 U. S. 317; *R. Co.* v. *Hall,* 232 U. S. 94; *Choctaw O. & G. R. Co.* v. *McDade,* 191 U. S. 64; *Texas & P. R. Co.* v. *Swearingen,* 196 U. S. 51; *Tuttle* v. *Detroit G. H. & M. Ry.* 122 U. S. 189; *Randall* v. *B. & O.* 109 U. S. 478; *Johnson* v. *Southern Pac. R. Co.* 196 U. S. 1; *Chic., M. & St. P. Ry. Co.* v. *Vollker,* 129 Fed. 522; *U. S.* v. *Nevada County, Y. G. R.* 167 Fed.

695; *Burho* v. *M. & St. L. Ry. Co.* 141 N. W. 300; *Grand Trunk W. Ry. Co.* v. *Poole,* 93 N. E. 26; *Hohenleitner* v. *So. P. Co.* 177 Fed. 796; *Willett* v. *Ill. Cent. R. Co.* 142 N. W. 883; *Chic. M. & P. S. Ry. Co.* v. *U. S.* 196 Fed. 882; *Delk* v. *St. L. & San F. R. Co.* 220 U. S. 580; *St. L. S. F. & T. R. Co.* v. *Seale,* 229 U. S. 156; *Lamphere* v. *Oregon R. & Nav. Co.* 47 L.R.A. (N.S.) 58; *Norfolk & West Ry. Co.* v. *Earnest,* 229 U. S. 114; *Seaboard Air Line Ry.* v. *Tilghman,* 237 U. S. 499; *Cooper* v. *Sillers,* 30 App. D. C. 567; *Scott* v. *Herrell,* 31 App. D. C. 45; *Wash. A. & Mt. V. Ry. Co.* v. *Downey,* 40 App. D. C. 147; safety appliance act (27 Stat. L., 531); employers' liability act (35 Stat. L., 65).

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

The case falls clearly within the employers' liability act. The oil-tank car arrived in the yard the morning of the accident over the Baltimore & Ohio Railroad, billed from Winton Junction, Ohio, to Cherry Hill, Virginia. The train that was being made up by the switching crew contained a number of cars from Baltimore, Maryland, destined to Fredericksburg, Virginia.

But two questions are presented,—negligence of defendant, and assumed risk. As to the former, we are of the opinion that there is a total failure to establish negligence on the part of defendant. While the evidence shows that the engine was moving at the rate of 4 miles per hour 8 or 10 feet from the tank car, there is no evidence to show the rate of speed at the point where the coupling was made. It must be assumed that the rate of speed decreased as it approached the coupling point, since plaintiff had time to adjust the knuckles with his hand, assume his position, and move the drawhead into position to make the coupling. While the rule of the company required a movement of the engine at not exceeding 2 miles per hour at the point of coupling, the speed could easily be reduced from 4 to 2 miles in a distance of 8 or 10 feet. If this could not be done, plaintiff is in poor position to invoke,

as a ground of negligence, that the conductor should have signaled and stopped the engine. But it is not important. If it appeared that the engine was moving in violation of the rule, it would not establish the negligence of defendant unless the speed contributed to the accident. The testimony wholly fails to even intimate that the accident was caused by the too rapid movement of the engine.

This largely disposes of plaintiff's chief charge of negligence. It is insisted, however, that the conductor should have so controlled the movement of the engine as to have prevented the accident. It is not apparent just how this could have been accomplished. From plaintiff's own statement, what did the conductor see? He saw plaintiff step upon the footboard, adjust the knuckles with his hand, take the usual position, and move the drawhead with his foot into position to make the coupling. Up until the moment the couplings were meeting, equipment was perfect, knuckles adjusted and open, drawhead in place, and plaintiff in usual position. To urge that the conductor was derelict in not stopping the engine by signaling to prevent the accident is to require the impossible.

The common-law rule of negligence is not modified by the employers' liability act. In *Seaboard Air Line R. Co.* v. *Horton*, 233 U. S. 492, 58 L. ed. 1062, L.R.A.1915C, 1, 34 Sup. Ct. Rep. 635, Ann. Cas. 1915B, 475, 8 N. C. C. A. 834, the court, defining the act in this particular, said: "It was the intention of Congress to base the action upon negligence only, and to exclude responsibility of the carrier to its employees for defects and insufficiencies not attributable to negligence." The common-law rule as to burden of proof remains unmodified.

Plaintiff's assertion that he depended upon the conductor to so regulate the movement of the engine as to avoid injury to him is a mere conclusion without facts to justify it. The dereliction of the conductor cannot be proved by the mental processes of plaintiff, but can only be proved by facts upon which an act of negligence can be predicated. As we have shown, there was no condition apparent up to the moment of

impact which was unusual or had even the appearance of danger. The statement of plaintiff that he "relied upon him (the conductor) to give signals in this case, as they always did when two of them worked together," proves nothing, unless it appears that a condition arose calling for signals, and at a time when the signals, if promptly heeded by the engineer, would, with reasonable certainty, have prevented the accident.

That plaintiff did not expect the conductor to stop the engine before making the coupling is borne out by his testimony where he states that "at all times, whenever the couplings need adjustment, they never shut the engine off, as a rule. They go ahead and make the adjustment while the cars are in motion, and it is necessary to go between the cars, as you cannot reach them from the outside." In answer to the question, "On such occasions what adjustments commonly have to be made?" he answered, "Opening knuckles and shoving drawheads one way or the other." It appears that whatever plaintiff in his mind may have expected from the signals of the conductor, it was not the duty of the conductor or the engineer to stop the engine before the coupling was made under the circumstances as they here existed.

In the recent case of *Reese* v. *Philadelphia & R. R. Co.* (present term) 239 U. S. 463, 60 L. ed. 384, 36 Sup. Ct. Rep. 134, where the alleged negligence on the part of the company consisted in the close proximity of two switching tracks, the court, through Mr. Justice McReynolds, stated the facts upon which the railway company was relieved of the charge of negligence, as follows: "Deceased was a capable, experienced fireman in a night switching crew operating in the yard, which was properly lighted, and acquainted with the general conditions described. The cause was tried upon the theory that about midnight, November 18, 1912, while his engine was moving 5 miles per hour along one of the parallel tracks, he attempted to procure drinking water at a tap in the side, near the bottom, and 3 feet from the front of the tender; that in doing so his body was extended outside the line of both tender and engine, and crushed by contact with a freight car stand-

ing on the other parallel track; and that the railway negligently constructed and maintained these tracks too near each other."

The facts in that case tend much stronger to establish negligence than do the facts in this.   There, the accident was due to the existence of a condition of the tracks for which the railway company was responsible, but of which the employee had notice, while here, the accident was not due to any condition of the tracks or equipment, but to a contingency which could not be foreseen or .guarded against by any reasonable act of care or diligence on the part of the railway company.

Assumption of risk is only eliminated as a defense in cases coming under section 4 of the employers' liability act, which provides as follows: "That in any action brought against any common carrier under or by virtue of any of the provisions of this act to recover damages for injuries to, or the death of, any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety  of employees contributed to the injury or death of such employee."   [35 Stat. at L. 65, chap. 149, Comp. Stat. 1913, § 8657.]   Had plaintiff's injury been caused through defective equipment, defendant would be estopped to interpose this defense.   But the court below properly disposed of this feature of plaintiff's case by directing a verdict for defendant on the count of the declaration charging defective equipment. Hence, "the defense of assumption of risk remains as at common law."   *Southern R. Co.* v. *Crockett,* 234 U. S. 725, 58 L. ed. 1564, 34 Sup. Ct. Rep. 897.

Plaintiff was a mature man thirty years' of age, with upwards of two years' experience as a brakeman in the railroad yard where the accident occurred.   The evidence discloses that he was familiar with the method of coupling cars on straight tracks and on curves.   At the moment of the accident, he was. standing with his left foot on the footboard and his right on the drawhead, facing the coupling, and where he could see the cars coming together.   It was daylight.   He was doing his work in the customary way.   His own witness Sparks testi-

fied that "it is common practice on railroads for a man to use his foot in pushing over a drawhead." That plaintiff was not depending upon the engine stopping is clear from his own testimony that "they never did stop" the engine, and that "they never shut an engine off as a rule." He was accustomed to go between the cars while in motion "at all times, whenever the couplings needed adjustment."

If the rule of assumption of risk ever is to be applied, it would seem to constitute a complete defense in this case. The work of a railroad brakeman is at best hazardous business, and when one engages in this employment he assumes the risks incident to the business. The rule is well stated by Judge Cooley, as follows: "The rule is now well settled that, in general, when a servant, in the execution of his master's business, receives an injury which befalls him from one of the risks incident to the business, he cannot hold the master responsible, but must bear the consequences himself. The reason most generally assigned for this rule is that the servant, when he engages in the employment, does so in view of all the incidental hazards, and that he and his employer, when making their negotiations, fixing the terms and agreeing upon the compensation that shall be paid to him, must have contemplated these as having an important bearing upon their stipulations. As the servant then knows that he will be exposed to the incidental risk, 'he must be supposed to have contracted that, as between himself and the master, he would run this risk.'" Quoted from *Tuttle* v. *Detroit, G. H. & M. R. Co.* 122 U. S. 189, 30 L. ed. 1114, 7 Sup. Ct. Rep. 1166. To the same effect are *Randall* v. *Baltimore & O. R. Co.* 109 U. S. 478, 27 L. ed. 1003, 3 Sup. Ct. Rep. 322; *Kohn* v. *McNulta,* 147 U. S. 238, 37 L. ed. 150, 13 Sup. Ct. Rep. 298; *Southern P. Co.* v. *Seley,* 152 U. S. 145, 38 L. ed. 391, 14 Sup. Ct. Rep. 530.

Nor does the fact that the coupling was being made on a curve affect the application of the rule. In the *Tuttle Case,* where the brakeman was coupling cars on a sharp curve and the drawheads failed to meet, allowing the cars to come together, crushing the brakeman to death, the court said: "We have care-

fully read the evidence presented by the bill of exceptions, and, although it appears that the curve was a very sharp one at the place where the accident happened, yet we do not think that public policy requires the courts to lay down any rule of law to restrict a railroad company as to the curves it shall use in its freight depots and yards, where the safety of passengers and the public is not involved; much less that it should be left to the varying and uncertain opinions of juries to determine such an engineering question.  *  *  *  The brakeman and others employed to work in such situations must decide for themselves whether they will encounter the hazards incidental thereto; and if they decide to do so, they must be content to assume the risks.  *  *  *  It is for those who enter into such employments to exercise all that care and caution which the perils of the business in each case demand.  The perils in the present case, arising from the sharpness of the curve, were seen and known. They were not like the defects of unsafe machinery which the employer has neglected to repair, and which his employees have reason to suppose is in proper working condition.  Everything was open and visible, and the deceased had only to use his senses and his faculties to avoid the dangers to which he was exposed."

In this unfortunate accident no fault can be attributed to the defendant company.  The equipment was perfect; the couplings were adjusted in place in the customary manner, and the engine was moved back with usual care.  At the crucial moment a contingency arose incident to the hazardous nature of his employment, when plaintiff slipped, and his foot was caught, with the resulting injury.  It is a case which invokes our deepest sympathy; but we must adhere to the law as we find it, and the law does not make a railroad company an insurer against every misfortune that may befall its employees.  *Reese v. Philadelphia & R. R. Co.* 239 U. S. 463, 60 L. ed. 384, 36 Sup. Ct. Rep. 134.

The motion for a directed verdict should have been sustained. The judgment is reversed, with costs, and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

Mr. Justice ROBB, dissenting:

The engine employed upon the occasion in question was of the "road type." This kind of an engine has a square tank on the tender, which renders it impossible for the engineer to see a brakeman in the position which this plaintiff occupied at the time of making the coupling in question. A yard engine, on the contrary, has a sloping tank on the tender, which does not obstruct the engineer's view. At the rear of the tender of this road engine was a footboard, upon which it was necessary for the plaintiff to stand to push over into proper position the 300 pound drawhead, "and there was no other way of pushing the drawhead over except with his foot." When plaintiff got upon the footboard to make the coupling, the engine was 8 or 10 feet from the car to be coupled, and then was going about 4 miles an hour. The conductor was standing directly behind the plaintiff, "possibly 6 or 8 feet away, and he was in a position to see everything that was going on and to pass signals; plaintiff relied on him to give signals in this case, as they always did when two of them worked together; plaintiff was standing on the step which runs across the back of the engine; by 'engine' he means the tender, the step that runs across the back of the tender, on the right side, engineer's side, and was in plain view of conductor Laycock, but was not in view of the engineer, Harrington, until he leaned back when he was shoving the coupling over, when his head and shoulders would extend and the engineer could see him; when a man is between the cars we always rely on the man on the ground to give the signals to slow up, and 'according to the rapidity of the movement of his hand the engineer understands whether he is to slack his speed or to stop;' plaintiff was not in a position to give a signal to the engineer—as to whether or not it was ready for a coupling to be made because he was adjusting the drawhead."

Under cross-examination plaintiff said: "I had the knuckles open and was shoving this drawhead and getting it in position. I really did not realize the proximity of the cars at the time.

I thought I would have ample time, and in case I did not, I thought Mr. Laycock, who was standing behind me, was in a position to give these signals and would check this engineer up in time to give me a chance to get in place. *That was his business, and what he is there for.* He was standing behind me and supposed to watch these movements of men in between the cars, or if the brakeman was behind me, he would be supposed to do the same thing. I cannot go in there, with my hands and feet occupied, and give these signals at the same time. * * * Plaintiff gave the engineer no signals at all to come back, it was not his duty to do so."

The learned trial justice denied the defendant's motion for a directed verdict. A jury of twelve presumably reasonable men accepted the very consistent and uncontradicted evidence for the plaintiff, and awarded him damages in the sum of $10,-000. Two judges, constituting a majority of this court, now say that this evidence so clearly falls short of proving negligence that reasonable men ought not to differ about it and, therefore, arbitrarily deprive this plaintiff of his constitutional right to a trial by jury.

In my view, the case is squarely ruled by the decision of the Supreme Court of the United States in *Illinois C. R. Co.* v. *Skaggs* (1916) 240 U. S. 66, 60 L. ed. 528, 36 Sup. Ct. Rep. 249. There Mr. Justice Hughes said: "The very purpose of having two brakemen was not to put upon either the entire responsibility. Working together under the exigencies of such operations, particularly when conducted in the nighttime, it was manifestly contemplated that the one brakeman would supplement the other, and not be compelled at the peril of his rights personally to examine what the other did or the basis of the reports the other gave." In fact, as I view the evidence, the negligence of the fellow servant is more apparent here than there. The engineer could not see plaintiff as he was in the act of pushing over the drawhead, nor could plaintiff see the engineer. The conductor, whose duty it was to regulate the speed of the engine and stop it entirely if the exigencies of the situation demanded, failed in his duty and this accident re-

sulted. It was for the jury to say whether the position occupied by plaintiff when the cars came together was such that a skilled observer like a conductor should have known that injury to the plaintiff might result. Anyone who has observed the coupling of either freight or passenger cars knows under what perfect control is the engine and how quickly it responds to the engineer's will. Had the conductor in the present case performed his duty, it is inconceivable that this accident could have occurred. Any speed that permitted the coming together of these cars when the plaintiff was in a position of apparent danger was a reckless speed, but it is apparent to me from a reading of the record that the jury were not misled upon this issue. The whole evidence was directed to a demonstration of the failure of the conductor to perform his duty.

Believing that a grave injustice is being done this appellee, I dissent from the judgment of the court.

A writ of error from the Supreme Court of the United States was granted by this court May 27, 1916.