# SOUTHERN RAILWAY COMPANY *v.* CROCKETT.

### ERROR TO THE SUPREME COURT OF THE STATE OF TENNESSEE.

No. 826.   Submitted April 16, 1914.—Decided June 22, 1914.

Motion to dismiss a writ of error to the state court to review a judgment in an action under the Employers' Liability Act in which the construction of the Safety Appliance Acts was involved, denied.·

By the Employers' Liability Act the defense of assumption of risk remains as at common law, save in those cases mentioned in § 4 where the violation by the carrier of any statute enacted for the safety of employés contributed to the accident.

This court has heretofore construed the letter of the Safety Appliance Act in the light of its spirit and purpose as indicated by the title no· less than by the enacting clauses and that guiding principle should be adhered to.

Although the original Safety Appliance Act may not have applied to vehicles other than freight cars, the amendment of 1903 so broadened its scope as to make its provisions, including those respecting

height of draw-bars, applicable to locomotives other than those that are excepted in terms.

By the amendment of 1903 to the Safety Appliance Act the standard height of draw-bars was made applicable to all railroad vehicles used upon any railroad engaged in interstate commerce, and to all other vehicles, including locomotives, used in connection with them so far as the respective safety devices and standards are capable of being installed upon the respective vehicles. *Chicago &c. Ry. Co.* v. *United States*, 196 Fed. Rep. 882, approved.

THE facts, which involve the construction and application of the provisions of the Safety Appliance Acts and of the Employers' Liability Act, are stated in the opinion.

*Mr. L. E. Jeffries* and *Mr. L. D. Smith* for plaintiff in error:

The Safety Appliance Act did not require a draw-bar thirty-one and one-half inches high. A switch-engine is not a freight car. The words "all cars" in § 2 are not applicable to height of draw-bars. The effect of the act of 1893, and the effect of the amendment of 1903 were misconceived by the Circuit Court of Appeals.

The defendant in error assumed the risk: such was the common-law rule and that doctrine was not abolished by the Federal Employers' Liability Act.

In support of these contentions, see *American R. R. Co.* v. *Birch*, 224 U. S. 544; *Baker* v. *Kansas City &c.*, 129 Pac. Rep. 1151; *Bowers* v. *Southern Ry. Co.*, 73 S. E. Rep. 679; *Burns* v. *Delaware Tel. Co.*, 7 N. J. L. 745; *California Bank* v. *Kennedy*, 167 U. S. 362; *Central Vt. Ry. Co.* v. *Bethune*, 206 Fed. Rep. 868; *Choctaw, O. & G. R. Co.* v. *McDade*, 191 U. S. 64; *Cleveland &c. Ry.* v. *Bassert*, 87 N. E. Rep. 158; *Creswill* v. *Grand Lodge*, 225 U. S. 246; *Eau Claire Bank* v. *Jackman*, 204 U. S. 522; *Employers' Liability Cases*, 223 U. S. 6; *Freeman* v. *Powell*, 114 S. W. Rep. 1033; *Gila Valley Ry. Co.* v. *Hall*, 232 U. S. 94; *Gulf &c. Ry.* v. *McGinnis*, 228 U. S. 173; *Hammond* v. *Whitt-*

*redge,* 204 U. S. 538; *Ill. Cent. R. R. Co.* v. *McKendree,* 203 U. S. 514; *Johnson* v. *Railroad Co.,* 196 U. S. 1; *Kan. City Sou. Ry. Co.* v. *Albers Com. Co.,* 223 U. S. 573; *Kizer* v. *Texarkana Ry. Co.,* 179 U. S. 199; *Louis. & Nash. R. R. Co.* v. *Lankford,* 209 Fed. Rep. 321; *McCormick* v. *Market Bank,* 165 U. S. 538; *Mich. Cent. R. R. Co.* v. *Vreeland,* 227 U. S. 59; *Mondou* v. *N. Y., N. H. & H. R. Co.,* 223 U. S. 1; *Neil* v. *Idaho,* 125 Pac. Rep. 331; *Neilson* v. *Lagow,* 12 How. 98; *Nutt* v. *Knut,* 200 U. S. 12; *Pennell* v. *Phila. & R. Ry. Co.,* 231 U. S. 675; *Rector* v. *City Deposit Bank Co.,* 200 U. S. 405; *St. L., I. M. & S. R. Co.* v. *Taylor,* 210 U. S. 281; *St. L., I. M. & S. R. Co.* v. *McWhirter,* 229 U. S. 275; *St. L., S. F. & T. R. Co.* v. *Seale,* 229 U. S. 156; *San Jose Land Co.* v. *San Jose Ranch Co.,* 189 U. S. 177; *Schlemmer* v. *Buffalo, R. & P. R. Co.,* 220 U. S. 590; *Seaboard Air Line* v. *Duvall,* 225 U. S. 477; *Seaboard Air Line* v. *Moore,* 228 U. S. 433; *Southern Ry. Co.* v. *Gadd,* 207 Fed. Rep. 277; *Swafford* v. *Templeton,* 185 U. S. 487; *Tex. & Pac. Ry. Co.* v. *Archibald,* 170 U. S. 665; *Tex. & Pac. Ry. Co.* v. *Swearingen,* 196 U. S. 51; *Un. Pac. R. R. Co.* v. *O'Brien,* 161 U. S. 451; *Un. Pac. R. R. Co.* v. *Fuller,* 202 Fed. Rep. 45; *Worthington* v. *Elmer,* 207 Fed. Rep. 306.

*Mr. J. A. Fowler, Mr. A. C. Grimm* and *Mr. H. G. Fowler* for defendant in error.

MR. JUSTICE PITNEY delivered the opinion of the court.

Crockett, the defendant in error, brought this action in the Circuit Court of Knox County, Tennessee, to recover damages for personal injuries sustained by him while in the employ of the Railway Company. The action was based upon the Federal Employers' Liability Act of April 22, 1908, c. 149, 35 Stat. 65, in connection with the Safety Appliance Act of March 2, 1893, c. 196, 27 Stat.

531, and the amendments of 1896 and 1903, c. 87, 29 Stat. 85; c. 976, 32 Stat. 943. He recovered a judgment in the trial court, which was affirmed by the Court of Civil Appeals. A petition for a writ of certiorari being presented to the Supreme Court of Tennessee, that court dismissed the petition and affirmed the judgment.

The facts, so far as material, are as follows: Defendant was an interstate carrier by railroad, and plaintiff was in its employ as a switchman and was engaged in a movement of interstate commerce at the time he was injured. The date of the occurrence was October 15, 1910. In making up a freight train, a switch-engine, with a freight car attached, was being moved down grade towards where other freight cars were standing upon the track, when the single car became uncoupled from the engine, and, being propelled by gravity towards the standing cars, came into contact with them. Plaintiff, being upon the car which thus became uncoupled, was by the impact thrown against the brake and injured. He insisted that the car became detached from the engine because of the defective condition of the track at that point, in conjunction with the insufficient height of the draw-bar on the engine. There was evidence tending to show that the ground upon which the track rested was wet and marshy, and the cross-ties broken and insufficient, so that the track was uneven and rough, and that, as a result, the engine and the car attached to it were made to alternately rise and fall at the ends where they were coupled together; and tending further to show that the draw-bar upon the engine, which was used in coupling the car to it, was not more than thirty inches high, measured from the track to the center of the draw-bar; that it was too low to engage properly with the couplers of ordinary freight cars, and that because of the resulting inadequacy of the coupling, together with the unevenness of the track, the car in question became detached. There was, however, evidence

tending to show that plaintiff knew of the defective condition of the track and of the engine; that he had passed over the same track frequently with the same engine, and that prior to the occurrence in question cars had, as he knew, repeatedly become detached from the engine because of the conditions mentioned. It was either found or assumed by the state courts that defendant's railway was of standard gauge, and that the standard height of draw-bars for freight cars ranged between a maximum of 34½ inches and a minimum of 31½ inches. See Resolution of Interstate Commerce Commission, June 6, 1893 (Ann. Rep. I. C. C., 1893, pp. 74, 263), construed in *St. Louis & Iron Mountain Ry.* v. *Taylor*, 210 U. S. 281, 286; see also, Ann. Rep. I. C. C., 1896, p. 94. It should be noted that the alleged cause of action arose October 15, 1910, after the enactment of the amendment of that year to the Safety Appliance Act, but before the taking effect of the Commission's order respecting draw-bars, made pursuant to the new law. This order while dated October 10, 1910, became effective on December 31 following.

Defendant requested the trial court to direct a verdict in its favor, upon the ground that plaintiff admittedly knew of the defects and therefore assumed the risk. The court refused the motion, and likewise refused the request of defendant for an instruction to the jury in the following terms: "If the jury should find from the evidence that the draw-bar of the engine was defective by being too low, or the track defective, and that this caused the engine to become detached from the cars, and this caused the plaintiff's injury, still, if you should further find that these defective conditions had existed prior to that time with the knowledge of the plaintiff, and plaintiff knew before he went to work that the defect existed at that time and that by reason thereof the engine had been accustomed to become uncoupled, and he appreciated the danger, then the court charges you that under those facts the plaintiff

could not recover, and your verdict should be in favor of the defendant."

The contentions of defendant, overruled by each of the state courts and here renewed, are, that by the true interpretation of the Employers' Liability Act the common-law rule respecting the assumption of risk was not abolished except in cases where the violation by thé carrier of some statute enacted for the safety of employés contributed to the injury of the employé; and that by the Safety Appliance Act and amendments, as properly interpreted, the height or construction of the draw-bars of locomotives was not regulated, so that the fact that the draw-bar in question was only thirty inches high was not a violation of these acts, and hence afforded no ground for a recovery under the Employers' Liability Act.

There is a motion to dismiss, based upon the insistence that the record presents no question reviewable in this court under § 237, Jud. Code (act of March 3, 1911, c. 231, 36 Stat. 1087, 1156).    The motion must be overruled, upon the authority of *St. Louis & Iron Mountain Ry.* v. *Taylor,* 210 U. S. 281, 293; *Seaboard Air Line Ry.* v. *Duvall,* 225 U. S. 477, 486; *St. Louis, Iron Mountain & Southern Ry.* v. *McWhirter,* 229 U. S. 265; *Seaboard Air Line* v. *Horton,* 233 U. S. 492, 499.

Upon the merits, we of course sustain the contention that by the Employers' Liability Act the defence of assumption of risk remains as at common law, saving in the cases mentioned in § 4, that is to say: "any case where the violation by such common carrier of any statute enacted for the safety of employés contributed to the injury or death of such employé."    *Seaboard Air Line* v. *Horton,* 233 U. S. 492, 502.

This leaves for determination the question whether the provision of § 5 of the Safety Appliance Act of 1893 respecting the standard height of draw-bars, together with the order of the Interstate Commerce Commission promul-

gated in pursuance of it, and the 1903 amendment of that act, had the effect of regulating the height of draw-bars upon locomotive engines, as contended by plaintiff, or upon freight cars only, as contended by defendant.[1]

---

[1] SAFETY APPLIANCE Act of March 2, 1893, c. 196, 27 Stat. 531.

"An Act to promote the safety of employés and travelers upon rail-roads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes, and for other purposes.

·*Be it enacted*, etc., That from and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train brake system, or to run any train in such traffic after said date that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose.

SEC. 2. That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.

   *     *     *     *     *     *     *     *

SEC. 5. That within ninety days from the passage of this act the American Railway Association is authorized hereby to designate to the Interstate Commerce Commission the standard height of draw-bars for freight cars, measured perpendicular from the level of the tops of the rails to the centers of the drawbars, for each of the several gauges of railroads in use in the United States, and shall fix a maximum variation from such standard height to be allowed between the drawbars of empty and loaded cars. Upon their determination being certified to the Interstate Commerce Commission, said Commission shall at once give notice of the standard fixed upon to all common carriers, owners, or lessees engaged in interstate commerce in the United States by such means as the Commission may deem proper. But should said association fail to determine a standard as above provided, it shall be the duty of the Interstate Commerce Commission to do so, before July first, eighteen hundred and ninety four, and immediately to give

In *Johnson* v. *Southern Pacific Co.*, 196 U. S. 1, a case that arose under the act as it stood before the 1903 amendment, it was held that the provision of § 2 rendering it "unlawful for any such common carrier to haul or permit

notice thereof as aforesaid. After July first, eighteen hundred and ninety-five, no cars, either loaded or unloaded, shall be used in interstate traffic which do not comply with the standard above provided for.

SEC. 6. That any such common carrier using any locomotive engine, running any train, or hauling or permitting to be hauled or used on its line any car in violation of any of the provisions of this act, shall be liable to a penalty of one hundred dollars for each and every such violation . . . *Provided*, that nothing in this act contained shall apply to trains composed of four-wheel cars or to locomotives used in hauling such trains.

\* \* \* \* \* \* \* \*

SEC. 8. That any employé of any such common carrier who may be injured by any locomotive, car, or train in use contrary to the provision of this act shall not be deemed thereby to have assumed the risk thereby occasioned, although continuing in the employment of such carrier after the unlawful use of such locomotive, car, or train had been brought to his knowledge."

AMENDMENT OF APRIL 1, 1896, c. 87, 29 Stat. 85.

"*Be it enacted*, etc., That section six of an Act entitled . . . . be amended so as to read as follows:

'SEC. 6. That any such common carrier using any locomotive engine, running any train, or hauling or permitting to be hauled or used on its line any car in violation of any of the provisions of this Act, shall be liable to a penalty of one hundred dollars for each and every such violation . . . *Provided*, that nothing in this Act contained shall apply to trains composed of four-wheel cars or to trains composed of eight-wheel standard logging cars where the height of such car from top of rail to center of coupling does not exceed twenty-five inches, or to locomotives used in hauling such trains when such cars or locomotives are exclusively used for the transportation of logs.'"

AMENDMENT OF MARCH 2, 1903, c. 976, 32 Stat. 943.

"*Be it enacted*, etc., That the provisions and requirements of the Act entitled 'An Act to promote the safety of employés and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes, and for other purposes,' approved March second, eighteen hundred and ninety-three,

to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars," was broad enough to embrace locomotive engines within the description "any car." This conclusion was based upon the declared purpose of Congress to promote the safety of employés and travelers upon railroads engaged in interstate commerce, and the specific intent to require the installation of such an equipment that the cars would couple with each other automatically by impact and obviate the necessity of men going between them either for coupling or for uncoupling. The court, by Mr.

---

and amended April first, eighteen hundred and ninety-six, shall be held to apply to common carriers by railroads in the Territories and the District of Columbia and shall apply in all cases, whether or not the couplers brought together are of the same kind, make, or type; and the provisions and requirements hereof and of said Acts relating to train brakes, automatic couplers, grab irons, and the height of drawbars shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, and in the Territories and the District of Columbia, and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith, excepting those trains, cars, and locomotives exempted by the provisions of section six of said act of March second, eighteen hundred and ninety-three, as amended by the act of April first, eighteen hundred and ninety-six, or which are used upon street railways."

\*     \*     \*     \*     \*     \*     \*     \*

AMENDMENT OF APRIL 14, 1910, c. 160, 36 Stat. 298.

\*     \*     \*     \*     \*     \*     \*     \*

"SEC. 3. . . . Said Commission is hereby given authority, after hearing, to modify or change, and to prescribe the standard height of draw bars and to fix the time within which such modification or change shall become effective and obligatory, and prior to the time so fixed it shall be unlawful to use any car or vehicle in interstate or foreign traffic which does not comply with the standard now fixed or the standard so prescribed, and after the time so fixed it shall be unlawful to use any car or vehicle in interstate or foreign traffic which does not comply with the standard so prescribed by the commission."

Chief Justice Fuller, pointed out (pp. 20, 21) that by the amendment of March 2, 1903, the provisions and requirements of the act were extended to common carriers by railroad .in the Territories and the District of Columbia, and were made to apply "in all cases, whether or not the couplers brought together are of the same kind, make, or type," and that the provisions and requirements relating to train brakes, automatic couplers, grab irons, and the height of draw-bars, were made to apply to "all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce." And it was said that this amendment was affirmative and declaratory of the meaning attributed by the court to the prior law.

In *Schlemmer* v. *Buffalo, Rochester &c. Railway*, 205 U. S. 1, 10, it was held that a shovel car was within the contemplation of § 2.

In *Southern Ry. Co.* v. *United States*, 222 U. S. 20, 26, it was held that the 1903 amendment had enlarged the scope of the original act so as to embrace all locomotives, cars, and similar vehicles used on any railway that is a highway of interstate commerce, whether the particular vehicles were at the time employed in interstate commerce or not.

In *Pennell* v. *Phila. & Reading Ry.*, 231 U. S. 675, the question was whether the provision respecting automatic couplers was applicable to the coupling between the locomotive and the tender. This was answered in the negative, the court saying (p. 678): "Engine and tender are a single thing; separable, it may be, but never separated in their ordinary and essential use. The connection between them, that is, between the engine and tender, it was testified, was in the nature of a permanent coupling, and it was also testified that there was practically no opening between the engine and tender, and that attached to the engine was a draw-bar which fitted in the

yoke of the tender, and the pin was dropped down to connect draw-bar and yoke. The necessary deduction from this is that no dangerous position was assumed by an employé in coupling the engine and tender for the reason that the pin was dropped through the bar from the tank of the tender."

In each of these cases, the letter of the act was construed in the light of its spirit and purpose, as indicated by its title no less than by the enacting clauses. The same guiding principle should be adhered to in considering the question now presented. Conceding .that it may be doubtful whether the act, in its original form, evidenced an intent on the part of Congress to standardize the height of draw-bars upon vehicles other than freight cars, and therefore assuming for argument's sake that the act was not in this respect applicable to locomotive engines, it seems to us that the amendment of 1903, manifestly enacted for the purpose of broadening the scope of the original act, must upon a fair construction be deemed to extend its provisions and requirements respecting the standard height of draw-bars, so as to make them applicable to locomotives, excepting such as are in terms exempted.

There was abundant reason for applying the standard to locomotives. The draw-bar—sometimes called the "draw-head"—carries at its outer end the device or mechanism for coupling the cars. The height of the draw-bar determines the height of the coupler, and has an intimate relation not only to the safety of the coupling operation but to the security of the coupling when made. See Car-Builders Dict. (1884), *tit.* "Draw-bar" and "Draw-head," and Figs. 395–643; Voss, Railway Construction (1892), pp. 16, 91, etc. The evidence in this case shows, without contradiction, that the gripping surface of the coupling knuckle on the freight car in question, measured vertically, was between seven and nine inches, and that

because' of the comparatively low level of the engine's draw-bar the effective grip was reduced to the point of practical inefficiency. Indeed, it is not seriously disputed that there exists as much reason for having the draw-bars of the locomotive adjusted to a standard of height as exists in the case of freight cars.

The experience of the Interstate Commerce Commission, in seeing to the enforcement of the act of 1893, tended to emphasize the importance of interchangeable equipment upon the rolling stock of railroads engaged in interstate commerce, so that cars used in such commerce would readily couple with cars not so used, .and that locomotives could be readily coupled with cars of either sort. The 16th Annual Report of the Commission, 1902, pp. 60, 61, recommended to Congress, *inter alia:* "That provisions relating to automatic couplers, grab irons, and the height of draw-bars, be made to apply to all locomotives, tenders, cars, and similar vehicles, both those equipped in interstate commerce and those used in connection therewith (except those trains, cars, and locomotives exempted by the acts of March 2, 1893, and April 1, 1896)." This recommendation appears to have been evoked by the decision of the Circuit Court of Appeals in *Johnson* v. *Southern Pacific Co.,* 117 Fed. Rep. 462, afterwards reversed by this court in 196 U. S. 1. The Court of Appeals held that there was nothing in the act of 1893 to require a common carrier engaged in interstate commerce to have every car on its railroad equipped with the same kind of coupling, or to require that every car should be equipped with a coupler that would couple automatically with every other coupler with which it might be brought into contact; and also that the act did not forbid the use of an engine not equipped with automatic couplers. Congress not only responded to the recommendation of the Commission, but enlarged the act more broadly by enacting (Amendment of March 2, 1903, set forth in foot-note,

*supra*) that the provisions and requirements of the original act should be held (a) to apply to common carriers by railroad in the Territories and the District of Columbia; (b) to apply in all cases whether or not the couplers brought together are of the same kind, make, or type; (c) that "the provisions and requirements . . . relating to train brakes, automatic couplers, grab irons, and the height of draw-bars shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, and in the Territories and the District of Columbia, and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith," excepting those exempted by the act of March 2, 1893, as amended April 1, 1896, and those used upon street railways. We have to do especially with the latter clause. As was intimated in *Southern Railway Co. v. United States,* 222 U. S. 20, 25, its collocation of phrases is not altogether artistic. But at least the purpose is plain that where one vehicle is used in connection with another, that portion of the equipment of each that has to do with the safety and security of the attachment between them shall conform to standard. We cannot assent to the argument that the clause means only that the locomotives used upon all railroads engaged in interstate commerce and in the Territories and the District of Columbia are to be equipped with the appliances provided by the original act for locomotives, and so on with the other classes of cars, and that hence the amendatory act has merely the effect of prescribing the standard height of draw-bars with respect to freight cars, because the original act required such a standard only with respect to cars of that type. This would give altogether too narrow a construction to the language employed by Congress, and would lose sight of the spirit and purpose of the legislation. We deem the true intent and meaning to be that the provisions and requirements

respecting train brakes, automatic couplers, grab irons, and the height of draw-bars shall be extended to all railroad vehicles used upon any railroad engaged in interstate commerce, and to all other vehicles used in connection with them, so far as the respective safety devices and standards are capable of being installed upon the respective vehicles. It follows that by the act of 1903 the standard height of draw-bars was made applicable to locomotive engines as well as to freight cars. And so it was held by the Circuit Court of Appeals for the Ninth Circuit in *Chicago &c. Railway Co.* v. *United States*, 196 Fed. Rep. 882, 884.

*Judgment affirmed.*