WILLIAM J. SMITH

*vs.*

WALKER D. HINES, Director General of Railroads.

Washington. Opinion December 18, 1920.

*Actions under Federal Employers' Liability Act. Defendant's negligence. Assumption of risk by plaintiff. The servant assumes the ordinary risks of his employment, but only such extraordinary and unusual risks as are obvious, and to him known and appreciated.*

This action is brought under the Federal Employers' Liability Act of April 22, 1908, 35 U. S. St. 65, C. 149, U. S. Comp. St. Secs. 8657-8665, to recover for injuries while employed by defendant as a freight conductor. The jury returned a verdict for the plaintiff for $8,454.66, and the case is before the court on the defendant's general motion for a new trial.

*Held:*

1. The record shows, and the jury was fully justified in finding, that the speed attained by the engine and sustained until the instant of impact was at least ten miles an hour; that no effort was made by the engineer to apply the brakes until the moving car was within from six to ten feet of the standing cars. That the impact was violent, every witness, including the engineer, say the cars came together with a crash. And as to the action of the brakes, a finding that the brakes did respond and act would be justified, for the "shaking and slatting" of the car can be explained upon no other theory.

2. A careful review of the evidence fails to satisfy us that the plaintiff was negligent in placing himself where he was, and doing what he did when injured. And as to defendant's contention that the plaintiff assumed all the risk of the particular danger which caused the damage to him, it is the opinion of the court that the plaintiff did not assume the risk. That he did assume the ordinary risks of his employment, and too that he assumed the extraordinary and unusual risks which are obvious, and risks of which he knew and which he appreciated, is well settled. But the circumstances of this case place it in a class far removed from the ordinary happening, and one in which, if cases do occur, they seldom reach courts of last resort.

3. The settled rule is, not that it is the duty of an employee to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but that

the employee may assume that the employer, or his agents, have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them.

An action under the Federal Employers' Liability Act to recover for personal injuries received while in the employment of defendant as freight conductor. Plea, the general issue, and a brief statement, alleging assumption of risk by plaintiff. A verdict of $8,454.66 for plaintiff was returned, and defendant filed a general motion for a new trial. Motion overruled.

Case fully stated in the opinion.

*Hinckley & Hinckley*, for plaintiff.

*Charles B. Carter, of White, Carter & Skelton*, for defendant.

SITTING: CORNISH, C. J., SPEAR, HANSON, DUNN, MORRILL, WILSON, DEASY, JJ.

WILSON, J. does not concur.

HANSON, J. This action is brought under the Federal Employers' Liability Act of April 22, 1908, 35 U. S. St. 65, C. 149, U. S. Comp. St. Secs. 8657-8665, to recover for injuries while employed by defendant as a freight conductor. The jury returned a verdict for the plaintiff for $8,544.66, and the case is before the court on the defendant's general motion for a new trial.

At the time of the injury complained of the plaintiff was in charge of a freight train of ten or twelve cars, which left Washington Junction on the defendant's railroad on the night of December 4, 1918, its destination being Ayers Junction on the same railroad. The record shows that shortly after leaving Washington Junction, a severe snowstorm was encountered, impeding the progress of the train, and that at many of the stations along the road cars were left on account of the intensity of the storm. This condition lasted until the train reached Harrington, when the storm abated. The train proceeded without further changes until reaching Robinson's Siding, a few miles west of Ayers Junction, at which siding a car was to be set off for use there. The train then consisted of the engine, four cars and a caboose car. Under the plaintiff's

orders an attempt was made to leave a car at the siding; the engine and one car, the car to the left as above, were separated, leaving three cars and the caboose on the main line. The engine with the car to be side-tracked proceeded to the switch, where it was discovered that on account of snow and ice the switch could not be opened. The latter fact was made known to the plaintiff, who ordered the brakeman to restore the car to the train. Having given that order, the plaintiff returned to the caboose, entered, and immediately went to the monitor, sat down in the swivel-chair with one foot on the iron rail and his train book on his knee, and attempted to change the entry relating to the car above mentioned. The caboose was constructed substantially the same as all such cars used by railroads, with the elevated swivel-chair, iron rails for foot-rests, and hand-rails, and the part above the car roof inclosed on the four sides by glass windows. While so engaged, and sitting as described, the plaintiff was injured by the impact caused by the attempt to recouple the cars uncoupled for the above named purpose. The plaintiff says the impact broke the glass in front of him, and that he was thrown violently forward and onto the glass, cutting his wrist and head and otherwise injured him.

The further facts necessary to be recited may be found in the evidence here given. The plaintiff's version of the accident:—

"Q. You went into the caboose and went up to the monitor, and sat down,—what were you doing? .

A. When I got up there and sat down, I took my small car book which is what we have to keep our records of the car movements on, to make up for the auditor. I took out my book and started to rub out the marking, to change the station symbol which we have to show that a car was to be left at Ayer Junction instead of Robinson's.

Q. While you had your book out writing or preparing to write this over, what was the next thing that happened that you know?

A. I had taken my book out of my pocket and had started to change the numbers. I had just got the number slightly erased, when the engine and car crashed into the train.

Q. Did you hear the crash?

A. I heard nothing but glass.

Q. What happened so far as you could see?

A. I went ahead in this manner (illustrating), right down on the glass, striking my cheek on the back of the center support which goes down on the left side.

Q. Cut your cheek?

A. Yes, sir.

Q. Any other injury?

A. Yes, cut my arm."

The engineer testified as follows:

"Q. You couldn't get the switch into a proper position to run in on the siding and leave that car?

A. No, sir.

Q. What was the next thing that happened?

A. The brakeman motioned for me to pull up; and we started back onto the train. I gave the engine a little steam, and shut her off and drifted down onto the cars. The first I noticed was Kallenburg running off to one side of the track and giving me a motion to stop. I put the brakes on; and on account of the ice and stuff, why she kept on going right along. We went down and made the hitch."

Walter C. Pettee, rear brakeman, testified:

"Mr. Kallenburg tried to throw the switch, but owing to the snow and ice around the point it was impossible to do so. He called to me; and I hollered to Smith, and Smith gave me directions to tell him to couple onto the train and we would set the car out at Ayer Junction and leave it there."

Q. What did you observe?

A. When they struck, the cars slatted back and forth so I naturally waited before I attempted to get on the minute they stopped; and just about as they stopped slatting, Mr. Smith opened the door and came out of the caboose. . . . ."

"Q. Describe to the jury the condition you found the caboose in inside when you went in?

A. I found the cushions knocked off onto the floor, and the water-pail upset, some water slopped onto the floor from the tank in where the wash water is kept, and the cover of that on the floor.

Q. Was there anything else movable in the caboose?

A. I should say everything in the caboose that was not securely fastened down was moved."

Carl H. Kallenburg, trainman, testified:

"I received orders to take the car and put it back on the train and proceed to Ayer Junction and leave it there. After I got the order to take the car back to the train, I signalled the engineman to back up."

"Q. What position did you get on the car?

A. I stood on the rear end of the car, that would be the end next to the cars that were left on the main line. . . .

Q. You gave the signal and then got on the rear of this car?

A. Yes, sir.

Q. What was the next thing that you noticed?

A. I noticed we were coming back pretty fast

Q. What did you do?

A. I thought we were coming more rapid than I thought we should be, and I gave a stop motion to the engineman.

Q. What motion did you give?

A. The stop motion in swinging the arm.

Q. Did that have any effect?

A. Not that I could see.

Q. Then what did you do?

A. I gave another stop motion.

Q. Did that have any effect?

A. Not that I could see.

Q. Then what did you do?

A. I gave another stop motion, and I jumped off.

Q. When you gave the third one, how near was the rear of your car to the car on which the caboose was attached, on that part of the train?

A. Well, I should think, I can't just exactly say how many feet, but somewhere between 5 or 6 or 10 feet.

Q. What did you jump off for?

A. Well, at the speed they were coming back, I thought it would be practically impossible, in the space that remained, to prevent their hitting hard, and I thought of the position I was in and I jumped.

Q. You attempted to save yourself?

A. Yes, sir."

The foregoing evidence presents the important facts clearly before the court, and was the subject substantially of the argument of counsel on both sides.

The defendant's counsel in their brief urged,—

"1.    That there is no negligence on the part of the defendant railroad corporation.

2.    That the case being admittedly one which falls under the Federal Employers' Liability Act, the plaintiff assumed all risk of the particular danger which caused the damage to him.

3.    That the damages are excessive."

Upon the first contention they say: "We do not dispute but what the impact of the two sections of this train in making the hitch was the force which caused the plaintiff to loose his balance while sitting in a careless manner in the seat on the monitor in the cupola of the caboose car,—but we do say this impact or force exerted when the hitch was made was in no way a negligent act on the part of the defendant railroad corporation. This is the only thing which the plaintiff complains of in the way of negligence, which narrows this case down to one particular issue."

We cannot concur in this view of the evidence. The record shows, and the jury was fully justified in finding, that the speed attained by the engine and sustained until the instant of impact was at least ten miles an hour; that no effort was made by the engineer to apply the brakes until the moving car was within from six to ten feet of the standing cars. That the impact was violent; every witness, including the engineer, said that the cars came together with a crash. And as to the action of the brakes, a finding that the brakes did respond and act would be justified, for the "shaking and slatting" of the car can be explained upon no other theory. The testimony of Mr. Pettee and the condition of the caboose after the accident sustain such conclusion. Mr. Kallenburg, the trainman who gave the motion to back, and from his position on the car attached to the engine gave three signals to the engineer to stop, and then jumped to save himself from injury, said that the cars to be coupled were then at most but ten feet apart. The engineer said he saw but one signal to stop, and that was when Kallenburg was on the ground beside the track, and the jury believed Mr. Kallenburg who was corroborated by the engineer's own statement as to conditions at the moment of impact.

The negligence of defendant's engineer was very apparent. Was the plaintiff negligent? We find nothing in the record to support a finding that he was not in the exercise of due care. The cir-

cumstances surrounding the case, with his simple recital of the known duties of a conductor, and the manner of their performance, and his action at the time of injury, negative the claim of negligence, and the admittedly ordinary process of coupling cars, which is usually accompanied by some force and some disturbance, has not been shown to require a conductor to stand or sit in any special place, or observe any special rule during the process other than that required by law that he shall exercise due and proper care and not be negligent. The jury had the right to consider and necessarily did consider the question so carefully covered by defendant's cross-examination, as to the conduct and acts of the plaintiff, and having before them the testimony as to the appearance of the movable articles in the car after the accident, to discuss the question where in the car, under the circumstances, the plaintiff would have been safe from injury, and what might have been the result if he had been in any other part of the car. A careful review of the evidence fails to satisfy us that the plaintiff was negligent in placing himself where he was, and doing what he did when injured.

As to defendant's second contention that the plaintiff assumed all the risk of the particular danger which caused the damage to him, for the reasons set forth above it is the opinion of the court that the plaintiff did not assume the risk. That he did assume the ordinary risks of his employment, and too, that he assumed the extraordinary and unusual risks which were obvious, and risks of which he knew and which he appreciated, is well settled. But the circumstances of this case place it in a class far removed from the ordinary happening, and one in which, if cases do occur, they seldom reach courts of last resort.

It is undisputed that the brakes were in perfect order, that the tracks were clear, that before the accident the caboose was in the usual orderly condition, and although the train had passed through several hours of storm, no other untoward event had occurred. Frequent stops had been made for the same purpose on the way, and aside from hardship due to severe weather, nothing unusual happened until the train arrived at Robinson's Siding. At this point the accident occurred, induced as we must hold by the fault of the engineer in attaining such great and unusual speed, and failing to check the same by the timely use of the air-brake, that the jury could not find otherwise than that the defendant's

engineer and servant was negligent, and that the plaintiff did not assume the risk. And so we must hold. The engineer's testimony, together with the history of the broken glass, the crash of the impact to which all witnesses testify, the disorder in the caboose, the testimony of Pettee that the car was still "slatting" when the plaintiff came out of the caboose door, presents a condition seldom observed and surely most extraordinary. That the plaintiff did not assume the risk of injury in such circumstances is well settled also.

The sections of the Federal Employers' Liability Law referred to read as follows;

"Section 8657. Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States or Territories, or between the District of Columbia or any of the States or Territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representatives, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

Section 8659. "In all actions hereafter brought against any such common carrier by the railroad under or by virtue of any of the provisions of this Act to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee; provided, that no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."

By the Employers' Liability Act the defense of assumption of risk remains as at common law, save in those cases mentioned in Section 4, where the violation by the carrier of any statute enacted for the safety of employees contributed to the accident. *Southern Railway Company* v. *Crockett*, 234 U. S., 725. *Seaboard Air Line* v. *Horton*, 233 U. S., 492, 502.

At common law the rule is well settled that a servant assumes extraordinary risks incident to his employment or risks caused by the master's negligence which are obvious or fully known and appreciated by him. *Boldt* v. *Pennsylvania R. R. Co.*, 245 U. S. 441, and cases cited. *Monk* v. *Power Co.* 112 Maine, 492. In *Chesapeake and Ohio Railway Co.* v. *De Atley*, 241 U. S. 311-315, where a brakeman was injured while attempting to board an engine moving at an unusual rate of speed, the court say: "According to our decisions, the settled rule is, not that it is the duty of an employee to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but that the employee may assume that the employer, or his agents, have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them;" citing *Gila Valley Ry. Co.* v. *Hall*, 232 U. S. 94, 101, *Seaboard Air Line* v. *Horton*, 233 U. S. 492, 494. See *Jacobs* v. *Southern Ry. Co.*, 241, U. S. 229; *Dutrey* v. *Philadelphia & R. Ry. Co.*, Penn. Sup. Court, 108 *Atlantic Rep.* 620, and cases cited; *Reed* v. *Director General of Railroads*, Penn. Sup. Court, 110 Atl. 254. In the last cited case it was held that "a member of a crew of a train in interstate commerce assumed the risk of injury or death while engaged in well-known dangerous yard movement, that of riding on front of a caboose pushed by an engine with duty to signal the engineer in time to stop, if a derailing device was set against further passage, so that his widow could not recover under the Federal Employers' Liability Act." In its finding the court upon the question of assumption of risk say: "Under the Federal Employers' Liability Act (U. S. Comp. St. 8657-8665), one engaged in interstate commerce is not absolutely deprived of recovery because of his contributory negligence; but neither he nor those claiming under him can recover, if an acci-

dent results from a risk assumed by him in the performance of his duties. The only exceptions to this are where the accident is the result of a breach of some statutory duty, in which event the employe is protected by Section 4 of the Act (*Seaboard Air Line Railway Co.* v. *Horton*, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915 C, 1 Ann. Cas. 1915 B, 475; *Southern Railway Co.* v. *Crockett*, 234 U. S. 725, 34 Sup. Ct. 897, 58 L. Ed. 1564), or where the risk is so unusual or extraordinary as to be outside of those normally and necessarily incident to the employment (*Dutrey* v. *Phila. & Reading Railway Co.* 265 Pa. 215, 108 Atl. 620). Neither of these exceptions have any application here." See *Anderson* v. *Director General of Railroads*, Court of Appeals, New Jersey, June 14, 1920, 110 Atl., 829, and *Chicago, R. I. & P. R. Co.* v. *Ward*, U. S. Sup. Court, March 1, 1920, Co.-Op. Adv. Sheets 1919-20 - April, 1920.

As to the third contention, that the damages are excessive, we are not persuaded that the jury erred in assessing damages. The injury incurred was very serious, causing substantially the loss of use of hand and arm, and the accompanying pain and suffering very great. So much appears from the evidence. The jury had the matter under consideration, with proper instruction from the presiding Justice, and no doubt had in view the purchasing power of money at the present time, as well as the testimony bearing upon the plaintiff's earning capacity past and present, and we are unable to say that they have erred in their judgment, and that the damages are excessive.

The entry will be,

　　　　　　　　　　　　　　　　　　*Motion overruled.*