## UNITED STATES v. CHICAGO, ST. P., M. & O. RY. CO.

District Court, W. D. Wisconsin.

Oct. 23, 1929.

Stanley M. Ryan, U. S. Atty., of Janesville, Wis. and M. C. List, Sp. Asst. to U. S. Atty., of Washington, D. C.

William T. Faricy, of St. Paul, Minn., (R. N. Van Doren and Nelson J. Wilcox, both of Chicago, Ill., on the brief), for defendant.

LUSE, District Judge.

The complaint states three causes of action, for violation of the order of the Interstate Commerce Commission issued pursuant to the provisions of section 2 of the Act of March 2, 1903 (32 Stat. 943 [45 USCA § 9]). That order reads as follows:

"That on and after September 1, 1910, on all railroads used in interstate commerce, whenever, as required by the Safety Appliance Act as amended March 2, 1903, any train is operated with power or train brakes, not less than 85 per cent. of the cars of such train shall have their brakes used and operated by the engineer of the locomotive drawing such train, and all power-brake cars in every such train which are associated together with the 85 per cent. shall have their brakes so used and operated."

The violations are alleged to have occurred on October 19, 1928, and October 20, 1928, complaint setting up two violations on the first of those two dates. Each cause of action presents the same legal situation as the other two, and the facts disclosed with respect to the first cause of action are all that it is thought necessary to state here. On October 19, 1928, the defendant, engaged in interstate commerce, operated over its line, westwardly from Hudson, Wis., its passenger train No. 405, consisting of a locomotive which was drawing a train and its tender, thirteen steel passenger cars, and another locomotive, which acted as a pusher engine for about four miles out of Hudson, together

with its tender. It seems that the grade out of Hudson, Wis., is too heavy for one locomotive to draw such train without assistance, and for fifteen years, without accident, the defendant has been accustomed to assist the drawing locomotive by coupling upon the rear end of the train such pusher engine, which assists in moving the train up the grade the necessary distance and then is uncoupled while the train is in motion and returns to its terminal. The air line from the rear car of the passenger train to the pusher locomotive is not coupled up, and the pusher engine and its tender are therefore not controlled by the engineer of the locomotive drawing the train. On the dates in question, this practice was followed. The "pusher engine" was equipped with power driving wheel brakes and apparatus for attachment and control of train brakes, and, had its air hose been connected to the rear coach of the train, its brakes and those of its tender could have been operated by the engineer of the "head engine."

All of the coaches of the train were equipped with operative train brakes, used and operated by the engineer of the "head engine," so that, whether the pusher engine and its tender be treated as one or two cars, more than 85 per cent. of the cars of the train were equipped for and controlled as required in the order above quoted.

The complaint charges violation of the law in general terms with respect to each alleged offense, averring that the defendant operated its train within this district with two of its power brake cars associated with the 85 per cent.; the two cars not having their brakes used and operated by the engineer of the locomotive. The amended answer discloses that the two cars complained of as being hauled in violation of law were the pusher engine and its tender, which were used as above generally described, and sets up numerous facts showing the claimed practical construction of the law by the Interstate Commerce Commission to permit such practice; the necessity or convenience served by omitting to couple the air line to the pusher engine by way of permitting its being uncoupled without first stopping the train, which latter operation would entail delay and also necessitate the continuance of assistance by the "pusher" several miles further to the top of the grade; that in the vicinity of Hudson, Wis., and St. Paul, Minn., on defendant's line and the lines of other railroads, this method of operation has been used for many years without accident; and other facts which need not be detailed.

To such answer the government's demurrer is interposed, sharply presenting two questions: (1) Was the "pusher engine" so circumstanced a "car" within the Safety Appliance Act and the order above quoted? (2) If so, was it associated with the 85 per cent. within the act and order?

The identical questions involved here were decided by District Judge J. B. Sanborn of Minnesota on September 23, 1929, in an action between these parties involving the same practice in the District of Minnesota (D. C.) 34 F.(2d) 812; his conclusion being that a pusher engine was not a "car" and was not associated with the 85 per cent. under the circumstances involved in that case, which were, so far as the legal questions involved, the same as in the case here.

■ That the word "car" is used in the Safety Appliance Act (45 USCA § 1 et seq.) in its generic sense and for many purposes includes locomotives, is settled. As to automatic couplers, see Johnson v. Southern Pacific Co., 196 U. S. 1, 25 S. Ct. 158, 49 L. Ed. 363; as to height of drawbar, see Southern Railway v. Crockett, 234 U. S. 725, 34 S. Ct. 897, 902, 58 L. Ed. 1564. It is a matter of congressional intent. The amendment of 1903 (32 Stat. 943, c. 976) provides: "The provisions and requirements hereof and of said Acts [Act of March 2, 1893, and April 1, 1896] relating to train brakes, automatic couplers, grab irons, and the height of drawbars shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce." Section 1 (45 USCA § 8).

And this language was expressly stated in the Crockett Case, supra, to mean: "That the provisions and requirements respecting train brakes, automatic couplers, grab irons, and the height of drawbars shall be extended to all railroad vehicles * * * so far as the respective safety devices and standards are capable of being installed upon the respective vehicles."

Hence it follows that a locomotive is not to be excluded from the operation of the order in question merely because the order uses the term "cars," if the order otherwise makes no sufficient distinction between cars and locomotives.

The first requirement of the order is that "not less than 85% of the cars of such train shall have their brakes used and operated by the engineer of the locomotive drawing such train." In such language a clear distinction

is made between the locomotive drawing the train and the cars composing the train. The locomotive is treated as the source of power, not only for drawing the train, but for the application of braking power to the "cars of such train." The idea conveyed is the ordinary one of a train of cars drawn by a locomotive, with a distinction drawn between two classes of vehicles. The next phrase is: "And all power-brake cars in every such train which are associated together with the 85 per cent. shall have their brakes so used and operated." So the real question involved here is whether the pusher locomotive here involved is a "power-brake car" within the meaning of the phrase last quoted. I have no doubt that, if a dead locomotive were being hauled in a train, being equipped with power brakes, it would be required to have its power brakes operated by the engineer of the head engine. Nor do I much question that, if this pusher engine were placed between the regular locomotive and the next car and then assisted in drawing the train, both engines would be required to have their power brakes connected by the air line and to the air line of the train behind. But that, I think, would be because both would be locomotives drawing the train and required to use and operate the train brakes of 85 per cent. of the cars in the train. Whether the placing of the helper locomotive at the rear of the train makes it any the less obligatory that its engineer shall use and operate the brakes of 85 per cent. of the cars of the train is a question not presented on this record and not argued. It is of course apparent that a train may lawfully have 15 per cent. of its cars hand-braked if located at the rear of the 85 per cent. and the engineer of a pusher engine used on such a train could not control the power brakes on the 85 per cent.

But the pusher engine in question, it seems to me, must be considered as a part of the motive power of the train. It was assisting in moving the train up the grade, had its own power plant, its own power brakes, and men at their posts ready to operate them. The crew of the pusher engine were there to co-operate with the crew of the head engine, to co-ordinate the movement of the pusher to the needs of the train, and its crew and power driving wheel brakes were ample to keep it from interfering with any control which the engineer of the head engine might care to exercise. The "pusher"

then was quite different from a power-braked car, which is inert, powerless, and without means of applying its power brakes, and which remains uncontrolled except its brakes be operated by the engineer of the head engine or the forbidden practice of using its hand brakes be indulged in. Furthermore, the practice in question has been followed for years by the defendant and other railroads in the vicinity of Hudson and St. Paul without accident. The operation of the pusher with its air line disconnected can hardly be said, therefore, to present any evil which the Safety Appliance Acts are designed to remedy, nor do I see any conflict between the operation in question and the spirit of the acts.

I hold that the "pusher" locomotive was not a power-braked car within the meaning of the Safety Appliance Act and the order of the Commission issued thereunder.

The second question assumes the status of the "pusher" as a car, and the defendant contends that, even though it be held such, it was not associated together with the 85 per cent. of the power-braked cars which had their brakes used and operated by the engineer of the head engine, and hence was not required to have its brakes so used and operated. Defendant relies largely upon inferences drawn from the opinion in the case of New York Central R. Co. v. U. S., 265 U. S. 41, 44 S. Ct. 436, 68 L. Ed. 892. Judge Sanborn apparently makes a like inference. While that case holds that power-braked cars, whose brakes are inoperable, may be hauled in a train if placed to the rear of all cars having their brakes operated by the engineer, at least 85 per cent. of all the cars having their brakes so operated, I think it very doubtful whether it was intended to approve as lawful the hauling of power-braked cars, the brakes of which are operable, to the rear of the 85 per cent., without their brakes being connected up and operated from the locomotive, unless disassociated from the cars having their brakes operated from the locomotive, as, for instance, by the interposition of a hand-braked car. I regard the answer to the second question sufficiently doubtful to warrant refraining from deciding it, inasmuch as the answer to the first question effectively disposes of the question now presented.

The demurrer to the amended answer will be overruled.