FORT WORTH & D. C. RY. CO. et al. v.
SMITHERS.   (No. 1997.) *

(Court of Civil Appeals of Texas.   Amarillo.
Dec. 6, 1922.   On Rehearing, Feb. 14, 1923.
Further Rehearing Denied March 7, 1923.)

1. Master and servant ⬤⟹110—Act not intended to require dumping of ash pan from engine cab.

It was not intended under Ash Pan Act (U. S. Comp. St. §§ 8624–8629) to require railroads to use equipment by which the ash pan could be dumped and cleaned by an employee from the cab.

2. Master and servant ⬤⟹265(4)—Locomotive ash pan presumed to comply with federal act.

In action under federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) for injuries to a hostler helper alleged as caused by railroad's violation of Ash Pan Act (U. S. Comp. St. §§ 8624–8629), it will be presumed, in the absence of evidence to the contrary, that the ash pan placed on the engine complied with the requirements of the act.

3. Master and servant ⬤⟹265(4)—Burden on plaintiff to prove defendant's failure to comply with Ash Pan Act.

In action under federal Employers' Liability Act for injuries to a hostler's helper, caused by an alleged failure to comply with Ash Pan Act, § 1 (U. S. Comp. St. § 8624), the burden was on plaintiff to prove such failure.

4. Master and servant ⬤⟹110—Ash Pan Act construed; "go under."

Under Ash Pan Act, § 1 (U. S. Comp. St. § 8624), prohibiting use of locomotive not equipped with an ash pan which can be dumped or cleaned without the necessity of employee going under such locomotive, the words "go under" have no technical meaning, and must be taken in their popular and usually accepted sense, and plaintiff did not prove a violation of the statute by showing that in closing the pan his body would be partially under the running board or the extension of the floor of the cab.

5. Master and servant ⬤⟹204(2)—Rule of assumption of risk abolished only where injury contributed to by violation of federal statute by carrier.

Under federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) it is only where the injury is contributed to by a violation of a federal statute by the carrier enacted for the safety of employees that the rule of assumption of risk is abolished.

6. Trial ⬤⟹350(6)—Refusal to submit issue answer to which would be a guess not error.

In action by a hostler's helper for injuries received while attempting to dump the ash pan of a locomotive, in which he alleged that he slipped on grease or greasy water in the engine cab while starting to alight, there was no error in refusing to submit an issue with reference to probable injuries if he had attempted to alight from the other end of the deck, as the answer would have been a guess.

7. Exceptions, bill of ⬤⟹8—Objections to certain evidence may extend to all of a certain kind.

Under district court rule 56 (142 S. W. xxi), providing that exceptions to evidence may be embodied in the statement of facts in connection with the evidence objected to, in a bill given to the admission of evidence, objections may be extended to all testimony of the same kind without the very words of the same or other witnesses being incorporated in that or other bills.

8. Damages ⬤⟹173(1)—Admitting testimony as to employee's right of promotion without showing rule therefor error.

In action under federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) for personal injuries to a railroad employee, admitting testimony of the chances of his promotion to a more lucrative position without showing a definite rule therefor was error.

9. Damages ⬤⟹170—Admitting evidence of plaintiff's being married and having children improper in personal injury action.

In action by a railroad employee for personal injuries, receiving evidence as to plaintiff's being married and having three children was improper.

On Motion for Rehearing.

10. Appeal and error ⬤⟹882(11)—Defendant not estopped on ground of invited error from insisting that evidence showed no violation of Ash Pan Act.

In action under federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) for injuries to a hostler's helper caused by an alleged failure to comply with Ash Pan Act, § 1 (U. S. Comp. St. § 8624), defendant, by requesting submission of an issue that, if the ash pan could be closed by a man on the ground without danger from movement of the engine while he was attempting to close it, and receiving a negative answer from the jury, was not estopped on the ground of invited error from insisting that the evidence did not show a violation of the act.

11. Master and servant ⬤⟹129(5)—Violation of Ash Pan Act not proximate cause of injury.

In an action under federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) and Safety Appliance Act (U. S. Comp. St. § 8605 et seq.) by a hostler helper who alleged injury while attempting to dump and clean the ash pan of a locomotive, and who, after his failure to dump the pan from the engine cab, slipped and fell on grease and greasy water while attempting to alight from the engine cab, held that, if it be conceded that the Ash Pan Act was violated, such violation was not the proximate cause of his injury.

12. Master and servant ⬤⟹210(2), 286(12)—Evidence held not to make negligence as to hostler's helper a jury question.

In an action, under federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) and Safety Appliance Act (U. S. Comp. St. § 8605

---

⬤⟹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted April 4, 1923.

et seq.) by a hostler helper who alleged injury while attempting to dump and clean the ash pan of a locomotive and who, after his failure to dump the pan from the engine cab, slipped and fell on grease and greasy water while attempting to alight from the engine cab, held, that the risk of injury from slipping on grease was assumed, and, plaintiff having shown no failure of the company to comply with the Ash Pan Act (U. S. Comp. St. §§ 8624–8629), evidence presented no question for jury.

Appeal from District Court, Dallam County; Reese Tatum, Judge.

Action by Glen Smithers against the Fort Worth & Denver City Railway Company and another. Judgment for plaintiff, and defendants appeal. Reversed and rendered.

See, also, 228 S. W. 637.

E. E. Whitted, of Denver, Colo., Tatum & Strong, of Dalhart, Turner & Dooley, of Amarillo, and Thompson, Barwise, Wharton & Hiner, of Fort Worth, for appellants. Bailey & Richards, of Dalhart, Joseph Gill, of Clayton, N. M., and Barrett & Works, of Amarillo, for appellee.

HALL, J. The appellee, Smithers sued the Fort Worth & Denver City Railway Company and the Colorado & Southern Railway Company to recover damages for personal injuries alleged to have been sustained by him while in the employ of the appellants at Texline as a hostler helper. The suit was instituted and tried under the federal Employers' Liability Act (Comp. St. §§ 8657–8665) and the Safety Appliance Act (Comp. St. § 8605 et seq.) and amendments thereto. Appellee alleges that the appellants were engaged in interstate commerce, and on April 24, 1917, the date of his injuries, he was in the general employment of the Forth Worth & Denver City Railway Company and in the special employment of the Colorado & Southern Railway Company; that his duties as hostler helper required him to build fires in locomotives and steam them up, to take charge of them when coming into the yards and roundhouse for repair, storage, and other purposes, to extinguish the fires therein, empty and clean the fire boxes and ash pans, and to prepare such locomotives generally for service; that on said date an engine engaged in interstate commerce came out of New Mexico to Texline, and was spotted at a point near the company's turntable in said town about 9 o'clock that night; that after the engine was spotted he went from the roundhouse with the hostler and another hostler helper for the purpose of extinguishing the fire, cleaning the fire box, emptying the ash pan, and working on and about the engine; that the ash pan in question was a large metal pan, built under the fire box, for the purpose of receiving ashes, cinders, and clinkers emptied from the fire box and was built with a view of being dumped, emptied, and cleaned by use of a lever extending up through the floor into the engine cab; that when the pan and lever were in ordinary state of repair the pan could be emptied by using the lever while in the cab and without the necessity of getting down and going under the engine or any part thereof; that when he went to the engine he climbed up into the cab, took hold of the lever, and made various attempts, after having opened the ash pan, to close it, and that the lever failed to work and operate and failed to close the pan; that he undertook to get down out of the cab, intending to go under the engine for the purpose of closing the pan; and in doing so turned around with his face toward the engine and looked into the cab of the engine, and when he started to alight while in such position his foot slipped, and he fell into the turntable pit, a distance of approximately 11 feet.

The specific grounds of negligence alleged are as follows: (a) The premises around and about the engine at the time and place in question were not lighted; (b) that the ash pan would not close without the necessity of appellee going under the engine in violation of the Safety Appliance Law, to wit, the federal Ash Pan Law; (c) that the engine he was working upon was moved on to the turntable by the hostler without his knowledge; (d) that the engineer and fireman who brought the engine into Texline, according to custom, had theretofore eaten their meals on the engine, and after eating had turned the water hose upon their dishes, washing the grease off of them onto the deck of the engine, and there was grease and greasy water on the deck and floor of the engine cab upon which he slipped. The specific injuries are set out, some of which he alleges resulted in partial paralysis, rendering him almost helpless in earning a living; that such injuries were permanent. His damages are fixed at the sum of $35,000.

The appellants answered by general demurrer, one special exception, general denial, and specially denied that they were guilty of negligence as charged. They pleaded assumed risk and contributory negligence with great particularity in several paragraphs; denied that any of the matters complained of were the proximate cause of the appellee's injuries.

By first supplemental petition appellee alleged that he did not know that the engine deck was covered with grease or greasy water; denied that he knew the dangers resulting from the premises and the engine not being lighted; alleged that he did not know the engine had been moved on to the turntable; that he was young and inexperienced in railroad work and not acquainted with the dangers incident thereto. He denied that he was simulating or faking in any of his alleged injuries.

In answer to special issues the jury found as follows: (1) That the engine in question was not equipped with an ash pan that would empty and close without the necessity of plaintiff going under or partially under the engine to operate it; (2) that it was necessary for plaintiff, in the discharge of his duties, to take a position on the ground under or partly under the engine to close the ash pan; (3) that in the discharge of his duties on the occasion in question the plaintiff started to get down out of the cab of the engine to close the pan from the ground; (4) that the failure to have an ash pan which would empty and close without the necessity of plaintiff's going under the engine to operate it contributed approximately to the plaintiff's injuries; (5) that plaintiff fell from the engine cab into the turntable pit; (6) there was grease and water on the deck of the engine at the time plaintiff undertook to go down out of the cab; (7) plaintiff did not know at the time he went up into the cab that there was grease and water on the deck; (8) that he did know of the dangers arising from said grease and water on the deck of the engine; (9) that a person of ordinary prudence, in the discharge of plaintiff's duties at that time, would have necessarily learned of the grease and water being on the deck of the engine; (10) that a person of ordinary prudence would have necessarily learned of the dangers arising in the discharge of plaintiff's duties from such grease and water; (11) plaintiff slipped on the grease and water and fell from the engine in attempting to get down from the cab; (12) plaintiff was unable to close the ash pan by the use of the lever in the engine cab before attempting to get down; (13) the failure of the ash pan to close by the use of the lever from the cab was a contributing proximate cause of plaintiff's injuries; (14) the defendants were negligent in permitting grease and water to be on the deck; (15) that the negligence of defendants in permitting such grease and water to be on the deck was a proximate cause of plaintiff's injuries; (16) that plaintiff has been injured in the way and manner alleged in his petition; (17) that plaintiff's injuries are the proximate result of his falling out of the cab into the turntable; (18) that plaintiff has been damaged by reason of said injuries; (19) that he had been damaged in the sum of $23,000; (20) that plaintiff was guilty of contributory negligence on the occasion in question; (21) that plaintiff's damages have been diminished $9,-800 by reason of his contributory negligence.

The court refused to direct a verdict for the defendants, and at their request specially instructed the jury not to take into consideration any injuries which plaintiff pretended to have, but did not really suffer. Findings on special issues submitted upon defendant's request are as follows:

(1) That slipping on the grease and water caused the plaintiff to fall.

(2) The plaintiff was not guilty of negligence, as that term is defined in the court's main charge, in working at the time and place, knowing that there was grease, or greasy water, on the apron.

(4) It was not plaintiff's duty to clean the grease or water off the apron of the cab.

(7) Failure of the ash pan lever to operate from the engine cab and slipping on the grease and water on the deck of the engine were the proximate causes of plaintiff's falling from the engine.

(13) Plaintiff's slipping on the grease was not the sole proximate cause of his injuries.

(18) The ash pan was not so equipped that it could be closed by a man standing on the ground without danger of being injured by any movement of the engine while attempting to close it.

This case has heretofore been before this court (228 S. W. 637), and upon the former trial the controversy was presented to the jury upon a general charge. The issues as made by the evidence and as submitted to the jury in several material points differ from those before us upon this appeal. The only two grounds of negligence submitted and considered upon this trial are the alleged violation of the Ash Pan Law and the negligence of the appellants in permitting grease and greasy water to accumulate upon the apron or deck of the cab. The appellee alleges that the violation of the Ash Pan Law contributed directly and proximately to his injuries.

[1] The first question therefore to be considered is: Are the appellants guilty as charged with violation of the Ash Pan Law in the equipment of the particular engine? The provisions of the Ash Pan Law, as found in U. S. Stat. at Large, vol. 35, pt. 1, p. 476, c. 225 (U. S. Compiled Statutes, §§ 8624–8629) are:

"Sec. 1. That on and after the first day of January, nineteen hundred and ten, it shall be unlawful for any common carrier engaged in interstate or foreign commerce by railroad to use any locomotive in moving interstate or foreign traffic, not equipped with an ash pan, which can be dumped or emptied and cleaned without the necessity of any employee going under such locomotive."

Section 2 forbids the use of locomotives not so equipped. Section 3 provides a penalty for a violation of the act and authorizes suits by the United States for such violation. Section 4 makes it the duty of the Interstate Commerce Commission to enforce the provisions of the act. Section 5 provides that receivers are included in the term "common carrier, and section 6 excepts from the provisions of the act locomotives which by reason of the use of oil, electricity, or other

agencies, do not require an ash pan. It will be noted that the act does not undertake to prescribe or describe any particular contrivance with which such engines should be equipped, but leaves that matter to the discretion of the railroad authorities. Congress did not intend to require railroads to use equipment by which the ash pan could be dumped and cleaned by an employee from the cab.

We gather from the record describing the equipment in question, and as shown by photographs of the engine from which the appellee fell, that there was a rod which extended from inside of the cab of the engine through the floor thereof, near the wall on the left hand side of the cab down to about 2½ feet above the ground. The upper end of this rod, when the ash pan was closed, was so constructed that it was fastened to a hook inside the cab. The lower end was connected by a bolt and movable joint to a second rod, which ran horizontally and parallel with the left side of the engine and toward the front of the engine, where it was connected firmly to the outer end of a third rod, which ran at right angles under the engine where said third rod was connected in some way, not described in the record, with the ash pan. According to the particular mechanism of the equipment, the act of the employee in raising and lowering the first-mentioned rod, from his position in the cab, would have the effect of opening and closing the bottom of the ash pan in such manner as would result in dumping and cleaning it. It appears that when this equipment was in working order the ash pan could be cleaned and emptied by its operation from the cab. The Ash Pan Act, however, does not require equipment to such extent. The appellee testified that on the night in question he tried 10 or 12 times, while in the cab, after having emptied the pan, to close it, and says that because of cinders or clinkers or a high pile of ashes he was unable to close it from his position in the cab. Failing to do so, he intended to get down on the ground and close the ash pan by lifting up the front end of the second rod, stating that he had frequently closed it in this way. He contends, however, that in assuming a position upon the ground which would enable him to so close it he would be partly under the engine. The photographs which are made exhibits to and part of the statement of facts show an employee operating the equipment while standing something over 2 feet from the rails, although about 18 inches above his head and extending out 5 or 6 inches over that side of his person next to the engine is seen what we take to be an extension of the floor of the cab or outer edge of the running board of the engine. A witness for the appellants testified that he had frequently opened and closed the ash pan while standing upon the ground on the side of the second rod farthest from the engine, and the pictures show an employee operating it in this way.

The inevitable conclusion from the evidence upon this point is that, when so working it, the danger to the employee is reduced to a minimum, and it cannot be held, when the law is reasonably construed, that such employee is in any sense required to "go under" the engine. The appellee testified that his method of operating the equipment when upon the ground was to stand at the front end of the second or horizontal rod, placing his hands on either side and under the rod, immediately behind the first rod, which extended up into the cab, raising the front end of the second rod until he could get his shoulder under it, thus giving him more power, and then he could raise the rod until the pan was closed, provided the equipment was in working order. His further statement is, if while so standing the engine should be moved forward, the perpendicular rod and the end of the horizontal might knock him down.

As we construe the law, it did not require the appellants to have either the first or second rods described above, and according to the record the third rod which was fastened to the ash pan might reasonably have been operated by the use of a crank or other leverage attached or attachable to its outer end. The evil which the law was intended to remedy was to require such a contrivance as would enable employees to open and close the ash pan without getting under the engine; that is, in such position between the rails or so close to the wheels or other parts of the engine that an unexpected movement would result in injury. The appellee, in operating the equipment, might have taken his position between the horizontal rod and the track. This, of course, would greatly enhance the danger. By taking his position as he describes at the front end of the rod, the danger would be lessened, but might result, in the event of a sudden forward movement of the engine, in knocking him down. If, however, he should take his position on the side of the horizontal rod farthest from the engine, it appears to us that there would be practically no danger from any movement of the engine, backward or forward, unless he should persist in holding to the rod after the engine commenced to move. There is no testimony tending to show whether or not he could have closed the pan at that time from the ground. His evidence does not show that his failure to close it from the cab was because of defects in the ash pan equipment, but tends to show that it was because of the presence of cinders and clinkers piled upon the track.

[2] In the absence of evidence to the contrary, it must be presumed that the appel-

lants have provided such equipment as the law required, and that the Interstate Commerce Commission, in the performance of its duty, had approved the equipment, and that the contrivance on that particular engine fully complied with the requirements of the ash pan law; i. e., that the equipment was such that the ash pan could be dumped and cleaned without the necessity of an employee having to go under the engine. Ft. Worth & Denver City Railway Co. v. Smithers, 228 S. W. 637, (7).

[3] Since the appellee bases his right to recover in part upon the failure of appellants to comply with the requirements of the Ash Pan Law, the burden is upon him to prove such failure. Proof merely showing that it would not be operated from his place in the cab falls short of discharging this burden, since the law does not require equipment which can be operated from that position. And his further failure to show that it could not have been operated upon this occasion from a position of safety upon the ground forces us to the conclusion that he has failed to establish this ground of negligence. If he decided to operate it from the ground, considerations of safety would require him to take such a position, if there was one which would enable him to accomplish his purpose without danger. We think it is clear that, if he had attempted to operate it in the manner shown in the pictures and described by the appellant's witness Roach, there would have been, at most, a minimum of danger, and in no event could it be said that he was, within the meaning of the law, under the engine. It is true that the jury found that the equipment is not such that the ash pan would empty and close without the necessity of plaintiff going under or partially under the engine to operate it. In arriving at this finding the jurors evidently misinterpreted the language of the act, concluding that, if an employee would be partially under the projecting floor of the cab, he would at least be partially under the engine.

[4] The words "go under" have no technical meaning, and, as used in the Ash Pan Act, must be taken in their popular and usually accepted sense. To require railroad companies to so equip their engines that a party could stand where no part of the top of the engine, regardless of how far it might be above his head, would extend over him, might result in the presence of appliances which would result in great danger, because of their extension several feet beyond the rails, rendering them menaces to people and to buildings, mail cranes, and other structures near the track.

[5] Having concluded that plaintiff has failed to establish a violation of the Ash Pan Law, thus removing this element of negligence from the consideration of the case, the further question presented is the charge of negligence in permitting grease and greasy water to be and remain upon the apron or deck of the cab and its effect upon the right of appellants to rely upon the defenses of assumed risk. It is only where the injury is contributed to by a violation of a federal statute by the common carrier enacted for the safety of employees that the rule of assumption of risk is abolished. In all other instances it remains in force. Southern Railway Co. v. Crockett, 234 U. S. 725, 34 Sup. Ct. 897, 58 L. Ed. 1564; K. C. S. Ry. Co. v. Livesay, 118 Ark. 304, 177 S. W. 875; Cross v. C., B. & Q. Ry. Co., 191 Mo. App. 202, 177 S. W. 1127; T. & P. Ry. Co. v. White (Tex. Civ. App.) 177 S. W. 1185.

By referring to the special findings Nos. 6, 9, 10, and 8, supra, in the order stated, it will be seen that the jury determined that there was grease and water on the deck of the cab or engine at the time plaintiff undertook to go down out of the cab; that a person of ordinary prudence, in the discharge of his duties at that time, would have necessarily learned of the grease, water, and greasy water being on the deck; that a person of ordinary prudence would have necessarily learned of the dangers arising therefrom, in the discharge of his duties; and that he actually knew of the dangers mentioned. These findings are not complained of by the appellee. Their effect is plain. We cannot set them aside, and must necessarily hold that appellee assumed the risk, since they are supported by the evidence. In describing the occurrence that night, the appellee said that, as hostler helper, he, together with Lynas, another helper, and Hannah, the hostler, went to the engine to kill the fire and do the preliminary work required to be done before the engine was put in the roundhouse. He said:

"My torch burned only a few minutes after I got out there on the engine. I went up into the engine to open the ash pan and shake the ashes out of the grates. There is a lever on each side of the fire box door you shake the grates with. There are graters under the engine, under the fire box. While we were shaking them the engine was being moved backward and forward so that the cinders would not fall in one place; that was to be kept moving while we were shaking out the cinders and ashes. The first thing I did after I got in the cab was to open the ash pan so they could not fall in the pan. It is under the grates. I think the ash pan is a little forward in front of the grates. I opened that. By opening that I learned that there is a slide door where you open it. It pulls it back so that the clinkers and ashes will fall on the ground. That door is at the bottom of the ash pan. I opened it by the lever that extends up in the cab on the fireman's side, which I pushed down to open the pan. The lever that operates the ash pan you push it down. It has a hook that it hangs on, and, when you close it, it pulls up. The lever enters the cab directly in front of the fireman's seat; that is on the left-hand side;

I don't remember how far back from the end of the cab, but several feet. It comes up through the bottom. When I took hold of it, it was pulled up and hanging on to a notch. To open the pan I took it off the notch and pushed the bar straight down. It goes down through the floor of the cab. The lower end of that bar joins onto another, and there is another lever joins onto that which runs to the ash pan. The second bar does not run back toward the back end of the cab; it runs forward towards the front end. The lever that joins to this bar the iron that I pushed down controls the ash pan, too. By pushing that lever down you pull the door of the ash pan open. We were to leave it open while shaking the grates. After we got through shaking the grates we had to close the ash pan before going into the roundhouse or onto the turntable. We were to close the ash pan by using the lever that extended up into the cab that I opened it with; that is, by pulling it up in the same position I found it. I tried to pull it up. I suppose I made 10 or 12 efforts to do so, but did not succeed. I did not close it because the lever would not come back up. I then started to get out of the engine to close it from the ground. If I had gotten on the ground,. I could have put my shoulder under the lever on the ground and raised up with it. I have closed one in that way. I, did not get down out of the cab; I fell out of it. I had ,my torch in one hand and started to get out. The torch was not lighted at that time; do not remember which hand I had the .torch in. I turned around to get out of the cab backwards, and my foot slipped or something, I don't know what it was, and I fell out backwards. The proper and customary way to get out was to turn around ,backwards. When I went up into the cab I noticed that the engine deck was wet with something. I don't know what that was. I suppose it was water; I am not certain about it. When I started to get out, my foot slipped, and I fell backwards to the bottom of the turntable. I did not know that the engine had been moved onto the turntable pit. I fell about 11 feet to the bottom of the pit, which was covered with chalky rock or concrete. I saw the water or something on the deck when I first got into the engine cab, and before my light went out. I noticed that it was wet, seemed like all over. My information as to how the water probably came there is that most of the northern crews ate their supper on the engine and washed the dishes off on the deck as they came in usually. Sometimes we had to wait until they ,got through washing their dishes off before we took charge of the engine. I don't know that the water on the deck was greasy. I had seen the engine crews wash their dishes off on the deck several times. Sometimes they would shovel coal back and wash off the deck and make it clean. My foot slipped on the wet part of the deck. The deck is either steel or sheet iron. I was on the deck, walking back and forth over it, while Lynas and I were shaking the grates that night. I saw it when I first got on it; could see it glistening from the light of my torch. I first set the torch down on the floor, and then I set it on the fireman's seat. It was 4 or 5 minutes after I got up in the cab before my light was blown out. I remained there 20 or 25 minutes

before I undertook to alight from the engine. I didn't see water put on the deck, and don't know where it came from; don't know whether the engineer and fireman ate any meals on the engine that day or not. They were not on the engine when I got there. When you crawl up in the engine I suppose water would be on the apron. I know the dangers of slipping in grease, though I didn't know that was grease. I knew the danger that night; would have known it if I had thought about it. I also knew the danger of slipping in water that was on iron or steel. The lever that runs up in the cab is used to dump while the engine is in motion. The fireman uses that when they are out making a run. I can stand in the ground and also dump the lever. It can be dumped from either the cab or while standing on the ground if it operates. I was going to get on the ground and put my shoulder under it to push it or try to push it in because I figured it that in that way I could get more strength against it to close it; I can get better leverage."

Having concluded that under a reasonable construction of the Ash Pan Law, as applied to uncontroverted facts, there has been no violation by appellants of the requirements of the act, and the jury having found that appellee assumed the risk incident to the fact of the grease and water being on the deck of the engine, it follows that neither of these alleged grounds of negligence can be considered as a proximate cause of appellee's injury.

The record upon this appeal, by reason of additional facts not before shown, and special findings presenting many questions materially different from those discussed upon the first appeal, where several other issues of negligence were submitted, and upon a general charge, we deem it unnecessary, in view of a reversal, to again discuss questions disposed of upon the former appeal.

Paragraph 19 of the charge does not authorize the jury to find double damages.

[6] Since the evidence shows that the grease and water was all over the deck or apron of the cab, the issue requested by appellant with reference to probable injuries, if he had attempted to alight from the other end of the deck, was immaterial, and any answer that they might have made would have been simply a guess.

[7] District court rule. 56 (142 S. W. xxi) provides that exceptions to evidence may be embodied in the statement of facts in connection with the evidence objected to, and we see no valid reason why, in order to save time and labor, and to reduce the size of the record, the court may not, in a bill given to the admission of certain evidence, permit the objection to be extended to all testimony of the same kind without the very words of the same or other witnesses being incorporated in that or other bills.

[8] The court permitted the appellee and other witnesses to testify with reference to

his chances of promotion in the service to more lucrative positions. A part of the testimony of appellee is incorporated in the bill. The objection is to that and all similar testimony offered by the plaintiff or any of his witnesses upon the trial of the case, which the bill shows were objected to and the same ruling made by the court in every instance. The appellee was asked:

"Q. What were you making when you got hurt? A. $2.04 a night. Q. Amounting to how much? A. About $60 a month. Q. You worked seven days a week? A. Yes, sir. Q. What about the line of promotion for hostler's helpers' jobs; was there any? Were you in line for promotion?"

At this juncture the appellants objected for the reason that the case was one arising under the federal Employers' Liability Act and the amendments thereto and was being tried under the federal law, and as to whether or not there was a promotion for hostler's helpers' jobs was too remote, speculative, and immaterial. The appellee further testified:

"You asked me about the line of promotion from hostler helpers' jobs, and I was in line for promotion. In time, if I had kept my health and strength, I could have become fireman, I think. That was better pay, and there was a promotion above that for me to engineer, and that was better pay than the fireman, I understood."

George Long, a witness for appellee, testified:

"I am familiar with the rules of promotion and placement generally in the railroad service. You asked me to state whether or not there is a reasonable probability in a hostler's helper may be a fireman in the railroad service. Not any more than any other employee or laborer. There is a probability of it if they need him. That is not the line of his promotion. There is no line of promotion from hostler's helper or any other labor to a fireman. They pick a man that is capable of doing the work. You ask me if the following question was not asked me and didn't I make the following answer: 'Q. I will ask you, Mr. Long, whether or not there is a reasonable probability of a hostler's helper may be made fireman? A. Oh, yes; certainly.' That is right just as I answer it here. After a man becomes a fireman there is a line of promotion from fireman to engineer; that is where the line of promotion starts."

This witness testified that a fireman makes more than a hostler helper, and an engineer is paid more than a fireman, and admitted that the high wages he had testified about existed under the United States Railroad Administration. On cross-examination he testified in substance as follows:

"In order for a man to be a hostler, he has got to be a fireman. When a man's a hostler helper, when it comes to determining who will get the job as fireman, that is left up to the traveling engineer or roundhouse foreman to pick the man who they think is best qualified. There is no rule or regulation that a hostler's helper can lay his hand on and say, 'You have got to promote me to fireman.' A man can work as hostler's helper for six or seven years, and if there is a vacancy as fireman there is no rule or regulation that he can say to his employing officer, 'You have got to give me that vacancy.' It is up to the man he is working for as to whether or not he thinks he is fitted and qualified to fill that position. He is better to fill it possibly. Furthermore, when it comes to getting a fireman, the rule is the old hands—the man who has been in service longer—they get the preferred runs, and the preferred runs draw the biggest salary usually. It is also the rule that as long as there is a fireman on the extra board of the company you cannot call in outsiders to take the places until you fill up the places of all extra firemen. You have to. When a man first starts to fire, he is on the extra board. If a man lays off or something like that, or there comes an extra rush of business, the extra man goes out in his place. When he does get up to where he can fire, he has got to act as student fireman; he generally makes student trips. He goes out with some other fireman and engineer; that is known as student fireman. Speaking of promotions, the man longest in service is the man that is first considered for promotion seniority; that is the rule invoked and in full force; that applies to firemen and engineers—all services. You ask me did I ever know a hostler's helper to serve seven years without being promoted? There is no promotion, but if he was not advanced to some other position higher up I would think that he was an awful poor hostler's helper."

Temple, another witness for appellee and a hostler helper, testified as follows:

"You ask me if there have been any advancements or promotions there within my knowledge during the last two or three or four years from the simple position as what you hold to fireman and on up. There have been no promotions lately. I could not say there were any promotions, no advances. I don't think you can be promoted. I don't think a hostler's helper can be promoted to fireman unless they want him to be. You ask me if the former question was not asked me on the former trial and if I didn't answer it as follows: 'Q. John, I will ask you whether or not during the time you have been there you have known of any hostler's helpers becoming fireman? A. Yes, sir.' I made that answer. 'Q. About how many? A. Three to the best of my knowledge.' I know of two or three. I misunderstood you question a while ago. Those promotions that I knew of of hostler's helpers to fireman they were recently after I was first employed there."

On cross-examination he testified that he had been hostler helper since January, 1918, and with reference to such employees who have been promoted said:

"These men I said were promoted or put in as fireman, you ask me to state how long before I went there as a hostler's helper that they were promoted. I don't know if they were or that you could say they were really

promoted or .not. They asked to go to firing, and if there was an opening and they were eligible and the company told him they could do that. A man has to pass an examination to become a fireman. You ask me how many months before I went to work there when they became fireman. I don't exactly remember the time, but to give you my best judgment I believe right around close to four or five months. They were made firemen during the period of the war."

This question was considered by the Supreme Court of the United States in Richmond & Danville Railroad Co. v. Elliott, 149 U. S. 266, 13 Sup. Ct. 837, 37 L. Ed. 728, where the admission of such testimony without showing there was a definite rule providing for promotion was error, the court saying:

"It is enough to prove what the plaintiff has been in fact deprived of; to show his physical health and strength before the injury, his condition since, the business he was doing (Wade v. Leroy, 20 How. 34; Nebraska City v. Campbell, 2 Black. 590; Vicksburg & Meridian Railroad v. Putnam, 118 U. S. 545, 554), the wages he was receiving, and perhaps the increase which he would receive by any fixed rule of promotion. Beyond that, it is not right to go and introduce testimony which simply opens the door to a speculation of possibilities."

[9] The appellee was asked if he was a married man, and if he had any children. He said he was married and had three children. This testimony was objected to as being wholly immaterial, and, when the court stated that he did not see the relevancy of it, appellant's counsel said, "We will withdraw our objections, since it is before the jury." A little later on in the trial appellants' attorney referred to the statement made by appellee as to his being a married man and said, "Now, then, let me ask you this question." Appellee's counsel interposed the statement that the evidence was excluded. The court remarked, "I think it was excluded." There was some further discussion between the court and counsel for both parties. When appellants' counsel asked appellee if he was living with his wife, there was some further discussion, and the court instructed the jury verbally that the evidence offered as to plaintiff's marriage would not be considered upon the issues of negligence and measure of damages. The whole proceeding was improper and will probably not occur upon another trial.

Since the judgment must be reversed, we will not discuss the propositions under which it is insisted that the verdict is excessive.

In view of the disposition we make of the case, it will not be necessary for us to consider the remaining assignments.

The judgment is reversed, and the cause remanded.

## On Motion for Rehearing.

HALL, C. J. [10] The appellee contends that, because appellant, induced the trial court to submit their special issue No. 18, inquiring if the ash pan in question was so equipped that it could be closed by a man standing on the ground without any danger of being injured by any movement of the engine while so attempting to close the pan, and because the jury answered such issue in the negative, appellants are now estopped, on the ground of invited error, from insisting that the evidence does not show a violation of the Ash Pan Law. The Ash Pan Law prohibits a railroad from using a locomotive in interstate traffic which is not equipped with an ash pan which can be operated without the necessity of an employee going under the locomotive to operate it. It does not require the use of a locomotive which is equipped with an ash pan which can be operated without any danger to an employee. It does not undertake to say what character of device shall be provided by the carrier to meet the requirements of the law. It would be difficult to conceive of an appliance by which the ash pan could be operated from the ground by an employee absolutely without danger if the engine should move, if the employee persisted in continuing the work while it was moving. As stated in the original opinion, we think the appellee has failed to show that the equipment of the ash pan in question was a violation of the Ash Pan Law. A showing merely that its operation from some other position than under the engine was accompanied with possible danger does not bring it within the terms of the Ash Pan Law, and certainly would not render the carrier liable without a finding that the equipment upon the engine in question constituted negligence. If the ash pan is not equipped so that it can be operated without the employee going under the engine, the law has been violated, and no proof of negligence is required, but, if the contrivance is such that it may be operated without such necessity, but not without danger, then negligence is not presumed, but must be proved. In answering the first two issues the jury found that the engine was not equipped with an ash pan which could be operated without the necessity of plaintiff going under, or partially under, the engine, and that it was necessary for him, in the discharge of his duties, to take a position on the ground under, or partly under, the engine, to close the pan. These two issues were objected to by the appellants, but the objections have not been brought forward in the assignments or propositions. An employee might necessarily be partially under the engine and still not be in such place of danger as would show a violation of the Ash Pan Law, in equipping the engine, which required him to be partially under it, in which

event it would also be necessary to show negligence. To illustrate: Suppose the contrivance for operating the ash pan was so arranged that the employee would have to stand between the rails, in front of or behind the engine, then probably in case of a movement of the engine in his direction he would be in danger while operating it, but because he was not under the engine neither the spirit nor letter of the law would be violated, and proof of negligence would be required to fix the carrier's liability. It is true that by requesting special issue No. 18 the appellants have committed themselves to the theory that in operating the engine in question while standing on the ground the plaintiff was in danger, but this by no means confesses that the equipment did not comply with the law or that it constituted such negligence as would entitle plaintiff to recover.

We have again reviewed the appellee's testimony and are unable to find any definite statement to the effect that he tried to operate the pan from the cab after the engine moved out on the turntable track. He says:

"I don't know what was the matter. I don't know whether I was running along and got a cinder or not in it. At the time I was trying to close it I don't know whether the engine was standing still or moving; I don't know whether the ash pan caught on the high pile of cinders or not. If it caught on the high pile of cinders while the engine was standing still, I don't think I could have closed it. I don't know if it would catch on cinders whether that would prevent it from closing; I suppose it would."

The only reasonable inference from this and other testimony is that, while he was trying to operate it from the cab, the cinders, which had been emptied from the pan, were piled so high on the ground under the pan that it would not close. He does not say how long it was after he quit trying to operate the pan from the cab until he started to alight and fell. There is no question but that he fell into the pit, and he expressly declares that he did not know whether the engine was standing still or moving while he was trying to close it from the cab. We find no warrant whatever in the testimony sustaining appellee's contention in the motion that at the time he was trying to close it "the engine was standing in the middle of the turntable about 11 feet above any ground on which cinders could have been piled." There is not a syllable of evidence to the effect that he endeavored to operate the ash pan from the cab after the engine had been moved onto the turntable. From the testimony of appellee and several other witnesses it appears that, when engines came in from a run in either direction from Dalhart, the engineer and fireman would run them on a track toward the roundhouse, stopping about 100 feet before they reached the turntable upon which such engines were switched to the various tracks leading from it into the several stalls of the roundhouse, and this custom was followed upon the occasion in question. There the regular engineer and fireman would abandon the engine. Then it was taken in charge by the hostler and his helpers. What was done by them afterward is described as follows: The appellee testified:

"When we first went to that engine it was on the cinder pit track 30 or 40 yards from the roundhouse. There was a turntable near there. It was headed into the turntable, and about 30 or 40 feet, I believe, from the turntable. There was not at that time a cinder pit along the track there, but the cinders were disposed of in this way: While we were shaking the grates, the hostler would move the engine back and forth so that they would not pile in one place, and then later on they were cleaned from the track. * * * My torch only burned a few minutes after I got out there on the engine. I went into the engine to open the ash pan and shake the ashes out of the grates. There is a lever on each side of the fire box door you shake the grates with. Those grates are under the engine, under the fire box. While we were shaking those the engine was being moved backward and forward so that the cinders would not fall in one place. It was to be kept moving while we were shaking out cinders and ashes. That was not the first thing I did after I got in the cab. The first thing I did was to open the ash pan so they could not fall in the pan. The ash pan is under the grates. I don't know whether it is directly under them or not; I think it is a little forward in front of the grates. I opened that. By opening that I mean there is a slide door where you open it. It pulls back so that the clinkers and ashes will fall on the ground. That door is at the bottom of the ash pan. I opened it by the lever that extends up in the cab on the fireman's side that I pushed down to open the pan. * * * By pushing that lever down you pull the door open. We were to leave that open while we were shaking the grates, and after we got through shaking the grates we had to close the ash pan before going into the roundhouse or onto the turntable. That was to be closed before we went onto the turntable. You asked me if I did that that night. I tried to. I made, I suppose, 10 or 15 efforts to pull it up, but I did not succeed. I pulled on it as hard as I could with my strength and jerked it. * * * The engine was still when I started to get out of it. Before the engine went to the pit the fire was supposed to be knocked and the ash pan closed and the turntable lined up. Lynas lined up the turntable that night. After the engine was ready to go on or ready for the turntable he had to go to the turntable and turn it around and line up the tracks—the one that the engine was on and the track that runs into the turntable. * * * I did not know the engine had been moved onto the pit. You ask me if I remember or had I noticed how long the engine had been still before I started down out of it. It had not been still but a few minutes, I don't think; I don't know. Lynas and I would be shaking the fire out after we would have our slides open, and

Hanna would run the engine back and forth on that cinder track. We would do that so we would not get it all in one pile and clog it up. After we would do that, then we would put the engine on the turntable to go in whatever stall in the roundhouse we wanted it to go into. When we got up into the engine, the lights were not burning in there at that time; I don't think they were. We all three went out of the office together. I think Hanna was the first man in the engine. The ash pan opened all right. Lifting this iron bar is the first thing I did. Then I started shaking the grates. It was about 20 or 25 minutes, according to my best judgment, after my torch went out until I started to get down and fell. * * * Q. You didn't get down there [on the ground] that night and didn't try to lift up? A. No. sir. Q. You won't swear before the jury that, supposing you got down there that night and you took hold of this [horizontal] rod this way, with your back towards the south and your face toward the big drivewheels, who won't swear that you could not have lifted it up that night, will you? A. No sir; I won't swear that I could not. I could state my reasons why. * * * I don't remember that I have testified before that Mr. Hanna turned the lights off. My testimony now, as I remember, him saying as we came out of the office, 'Better turn those lights off.' I don't remember who turned them off."

Hanna, the hostler who was moving the engine, testified in part:

"[Appellee] did not, to my recollection, on that night, say anything about the ash pan would not close or open, or anything. He did not make any remarks about the ash pan. * * * I said that I rolled that engine onto the turntable, as slow as I could move it— about a mile and a half or two miles an hour. When it went onto that turntable, it would make a jolt. It would jolt as well as make some noise; it would be worse than if going over a joint; it would be worse than a low joint."

The witness Lynas testified:

"With reference to the killing of the engine when we were shaking the grates to get the ashes and cinders out of the ash pan and the engine was moving slowly up and down on the track, you ask me about how close we were to the turntable. We would not drop the ashes any closer than 10 or 12 feet from the turntable, and the track was probably 300 feet long where we ran up and down there."

There is nothing in all of this testimony intimating that the ash pan, which appellee said opened without any trouble, failed to close because of any defects in it; on the contrary, he expressed the opinion, and all the testimony relating to the matter tends to indicate, that it was on account of cinders piling up on the track that it failed to close. Appellee does not charge the appellants with negligence in failing to have an ash pit, nor in failing to run the engine in such manner that cinders would not be caught in the ash pan. He charges that the ash pan was defective, and relies upon negli-gence per se. The burden was on him to establish its defective condition, and from his own testimony it is clear that he thinks the presence of cinders prevented him from closing it.

[11] In his supplemental motion for rehearing appellee says:

"If it is really the holding of this court that the Ash Pan Act was not shown violated because the position required on the ground for closing the pan did not require the entire body of the operator to be wholly under the engine, or if this court really believes the recent case of Phillips v. Pennsylvania R. Co. (C. C. A.) 283 Fed. 381, decisive of the question of proximate cause against appellee, the court should make effective decision by reversing and rendering the case."

As stated in the original opinion, the appellee did not show a violation of the Ash Pan Act by proving that in closing the pan while upon the ground his body would be only partially under the running board of the engine or the extension of the floor of the cab. We also believe that the Phillips Case is decisive of the question of proximate cause. In that case it was shown that Phillips, a fireman, had observed that the automatic bell ringer was not working; that he asked the engineer for a monkey-wrench, and, taking this and a piece of wire, went forward to repair the bell ringer. He climbed over the top of the cab, thence along the top of the boiler to the bell ringer, situated on the front end of the locomotive, and in doing so passed over the steam dome of the boiler. While he was repairing the bell ringer the engineer descended from the cab and proceeded to oil the locomotive. After repairing the bell ringer Phillips started back to the cab. Just as he was stepping over the steam dome the safety valve popped, causing him to lose his balance and fall to the ground. When the engineer was about to leave the cab he turned off the blower, and the steam gauge was then registering 180 pounds. The valve in the steam dome was regulated to pop off at a pressure of 205 pounds. Some time after the accident the valve was tested, and it did not pop off until a pressure of 215 or 220 pounds was reached. The trial court directed a verdict for the railway company. The Circuit Court of Appeals held that the defective condition of the bell ringer was negligence per se, but manifestly in Phillips' journey the defective bell ringer was merely the occasion, and not the proximate cause of the accident. The Supreme Court of the United States refused a writ of certiorari. The appellee insists that the Phillips Case is not authority upon the issue of proximate cause in the instant case because in that case there was distinct succession in time of the two causes of defective ringer and the popping off of steam, the defect in the ringer having lost its power and efficiency before the matter

of popping steam came into action, and that in the instant case both the greasy water on the apron of the cab and the defective ash pan were acting together and concurrently. As heretofore stated, there has been no defect shown in the ash pan, but, if it be admitted that it was defective, and appellee had alighted from the cab in safety, and had remedied the defect, and fell because of the greasy apron, while climbing back into the cab, the cases would be identical.

[12] Believing that the Phillips Case applies in principle, and that appellee failed to show that the ash pan was constructed in violation of the Ash Pan Act, we adopt his suggestion and reform the judgment accordingly. It is therefore ordered that the judgment be reversed, and it is here rendered for the appellants.

Reversed and rendered.