SMITHERS v. FORT WORTH & D. C. RY.
CO. et al.   (No. 465–3967.)

(Commission of Appeals of Texas, Section B.
March 18, 1925.   Rehearing Denied by
Supreme Court April 29, 1925.)

1. **Master and servant** ⟨⟩265(9)—Locomotive
ash pan presumed to comply with federal act.

In action under federal Employers' Liabil-
ity Act (U. S. Comp. St. §§ 8657–8665) for in-
juries to hostler helper alleged to have been
caused by railroad's violation of ash pan act
(U. S. Comp. St. §§ 8624–8629), it will be pre-
sumed in absence of evidence to contrary that
ash pan placed on engine complied with re-
quirements of act.

2. **Master and servant** ⟨⟩238(3)—Injuries to
servant selecting unsafe method not action-
able.

Master is not liable for injuries to servant,
if he selects an unsafe method of doing his
work when a safe one is at hand.

3. **Courts** ⟨⟩97(5)—Servant's suit for inju-
ries under federal Employers' Liability Act
held controlled by federal decisions.

Suit by hostler helper under federal Em-
ployers' Liability Act (U. S. Comp. St. §§ 8657–
8665), for injury sustained in interstate com-
merce, was controlled by federal decisions.

4. **Master and servant** ⟨⟩110—Ash pan device
on locomotive held to comply with statute.

Ash pan device on locomotive which a man
could operate while standing on ground some-
thing over two feet from rails, although eight-
een inches above his head, and extending out
five or six inches over that side of his person
next to engine, *held* to comply with ash pan
act (U. S. Comp. St. §§ 8624–8629).

Error to Court of Civil Appeals of Seventh
Supreme Judicial District.

Action by Glenn Smithers against the Fort
Worth & Denver City Railway Company and
another.   Judgment for plaintiff was re-
versed by the Court of Civil Appeals in 249
S. W. 286, and plaintiff brings error.   Af-
firmed.

Barrett & Works, of Amarillo, Bailey &
Richards, of Dalhart, and Jos. Gill, of Al-
buquerque, N. M., for plaintiff in error.

Thompson, Barwise, Wharton & Hiner, of
Fort Worth, for defendants in error.

POWELL, P. J.   This is the second appeal
of this case.   Smithers recovered judgment,
which was reversed and the cause remanded
by the Court of Civil Appeals.   See 228 S. W.
637.   Upon a second trial of the case in the
district court he again recovered judgment.
The opinions of the Court of Civil Appeals
on this appeal can be found in 249 S. W. 286.
The Court of Civil Appeals tells us, and cor-
rectly, that "the issues as made by the evi-
dence and as submitted to the jury [upon
former appeal] in several material points

differ" from those before that court upon the
present appeal.

Upon this last appeal the Court of Civil
Appeals first rendered judgment reversing
the judgment of the trial court and remand-
ing the cause for another trial.   When this
judgment was rendered, counsel for Smith-
ers, as stated by the Court of Civil Appeals,
in making a motion for rehearing, said:

"If it is really the holding of this court that
the ash pan act was not shown violated be-
cause the position required on the ground for
closing the pan did not require the entire body
of the operator to be wholly under the engine,
or if this court really believes the recent case
of Phillips v. Pennsylvania R. Co. (C. C. A.)
283 F. 381, decisive of the question of proxi-
mate cause against appellee, the court should
make effective decision by reversing and ren-
dering the case."

In considering this proposition advanced
by counsel for plaintiff in error, the Court
of Civil Appeals acceded to the same, and,
upon motion for rehearing, reversed the
judgment of the trial court and rendered
judgment for the railway company.

The opinions of the Court of Civil Ap-
peals state the case fully in every particular.
We do not think it is necessary to restate
the case here, except in so far as may be
necessary to make clear the two proposi-
tions we shall discuss, and the decision of
either of which, in the view we take of the
case, settles the suit in favor of the rail-
way company.   In stating the general nature
of the case, the Court of Civil Appeals de-
clares:

"The appellee, Smithers, sued the Fort Worth
& Denver City Railway Company and the Colo-
rado & Southern Railway Company to recover
damages for personal injuries alleged to have
been sustained by him while in the employ of
the appellants at Texline as a hostler helper.
The suit was instituted and tried under the
federal Employers' Liability Act * * * and
the Safety Appliance Act * * * and amend-
ments thereto.   Appellee alleges that the ap-
pellants were engaged in interstate commerce,
and on April 24, 1917, the date of his injuries,
he was in the general employment of the Fort
Worth & Denver City Railway Company and in
the special employment of the Colorado &
Southern Railway Company; that his duties as
hostler helper required him to build fires in
locomotives and steam them up, to take charge
of them when coming into the yards and round-
house for repair, storage, and other purposes,
to extinguish the fires therein, empty and clean
the fire boxes and ash pans, and to prepare
such locomotives generally for service; that on
said date an engine engaged in interstate com-
merce came out of New Mexico to Texline, and
was spotted at a point near the company's
turntable in said town about 9 o'clock that
night; that after the engine was spotted he
went from the roundhouse with the hostler and
another hostler helper for the purpose of ex-
tinguishing the fire, cleaning the fire box, emp-

---

⟨⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

tying the ash pan, and working on and about the engine; that the ash pan in question was a large metal pan, built under the fire box, for the purpose of receiving ashes, cinders, and clinkers emptied from the fire box, and was built with a view of being dumped, emptied, and cleaned by use of a lever extending up through the floor into the engine cab; that when the pan and lever were in ordinary state of repair the pan could be emptied by using the lever while in the cab, and without the necessity of getting down and going under the engine or any part thereof; that when he went to the engine he climbed up into the cab, took hold of the lever, and made various attempts, after having opened the ash pan, to close it, and that the lever failed to work and operate, and failed to close the pan; that he undertook to get down out of the cab, intending to go under the engine for the purpose of closing the pan, and in doing so turned around with his face toward the engine and looked into the cab of the engine, and when he started to alight while in such position his foot slipped, and he fell into the turntable pit, a distance of approximately eleven feet."

It was further alleged:

"That the engineer and fireman who brought the engine into Texline, according to custom, had theretofore eaten their meals on the engine, and after eating had turned the water hose upon their dishes, washing the grease off of them onto the deck of the engine, and there was grease and greasy water on the deck and floor of the engine cab upon which he slipped."

As stated by the Court of Civil Appeals:

"The only two grounds of negligence submitted and considered upon this trial are the alleged violation of the ash pan law and the negligence of the appellants in permitting grease and greasy water to accumulate upon the apron or deck of the cab."

The Court of Civil Appeals unquestionably correctly holds that the company cannot be held liable because of the accumulation of grease on the apron or deck of the engine. We cannot do better than quote from its opinion in this connection:

"By referring to the special findings Nos. 6, 9, 10, and 8, supra, in the order stated, it will be seen that the jury determined that there was grease and water on the deck of the cab or engine at the time plaintiff undertook to go down out of the cab; that a person of ordinary prudence, in the discharge of his duties at that time, would have necessarily learned of the grease, water, and greasy water being on the deck; that a person of ordinary prudence would have necessarily learned of the dangers arising therefrom, in the discharge of his duties; and that he actually knew of the dangers mentioned. These findings are not complained of by the appellee. Their effect is plain. We cannot set them aside, and must necessarily hold that appellee assumed the risk, since they are supported by the evidence."

Smithers, being guilty of this assumption of risk, cannot recover for that particular negligence. There is no federal statute regulating such accumulation of grease, and hence the assumption of risk defense is not abolished as to that character of negligence. The Court of Civil Appeals correctly states the rule in this connection as follows:

"Having concluded that plaintiff has failed to establish a violation of the ash pan law, thus removing this element of negligence from the consideration of the case, the further question presented is the charge of negligence in permitting grease and greasy water to be and remain upon the apron or deck of the cab and its effect upon the right of appellants to rely upon the defenses of assumed risk. It is only where the injury is contributed to by a violation of a federal statute by the common carrier enacted for the safety of employees that the rule of assumption of risk is abolished. In all other instances it remains in force. Southern Railway Co. v. Crockett, 234 U. S. 725, 34 Sup. Ct. 897, 58 L. Ed. 1564; K. C. S. Ry. Co. v. Livesay, 118 Ark. 304, 177 S. W. 875; Cross v. C., B. & Q. Ry. Co., 191 Mo. App. 202, 177 S. W. 1127; T. & P. Ry. Co. v. White (Tex. Civ. App.) 177 S. W. 1185."

There is no controversy over the rule just announced. Therefore we come to consider the two controlling questions upon this appeal, as follows: (1) Was there a violation of the federal ash pan law? (2) If so, was such a violation thereof a proximate cause of the injury? The Court of Civil Appeals decided both of these issues in favor of the company. If correct in either holding, judgment was properly rendered for the company.

What is this ash pan law? It can be found in United States Statutes at Large, vol. 35, pt. 1, p. 476, c. 225 (U. S. Compiled Statutes, §§ 8624–8629). The pertinent part of the law reads as follows:

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that on and after the first day of January, nineteen hundred and ten, it shall be unlawful for any common carrier engaged in intrastate or foreign commerce by railroad to use any locomotive in moving interstate or foreign traffic, not equipped with an ash pan, which can be dumped or emptied and cleaned without the necessity of any employee going under such locomotive."

Speaking of this act, and describing the devices of that kind with which the locomotive in question was equipped, the Court of Civil Appeals states:

"It will be noted that the act does not undertake to prescribe or describe any particular contrivance with which such engines should be equipped, but leaves that matter to the discretion of the railroad authorities. Congress did not intend to require railroads to use equipment by which the ash pan could be dumped and cleaned by an employee from the cab. We gather from the record describing the equipment in question, and as shown by photographs of the engine from which the appellee fell, that there was a rod which extended from in-

side of the cab of the engine through the floor thereof, near the wall on the left-hand side of the cab down to about two and one-half feet above the ground. The upper end of this rod, when the ash pan was closed, was so constructed that it was fastened to a hook inside the cab. The lower end was connected by a bolt and movable joint to a second rod, which ran horizontally and parallel with the left side of the engine and toward the front of the engine, where it was connected firmly to the outer end of a third rod, which ran at right angles under the engine where said third rod was connected in some way, not described in the record, with the ash pan. According to the peculiar mechanism of the equipment, the act of the employee in raising and lowering the first-mentioned rod, from his position in the cab, would have the effect of opening and closing the bottom of the ash pan in such manner as would result in dumping and cleaning it. It appears that when this equipment was in working order the ash pan could be cleaned and emptied by its operation from the cab. The Ash Pan Act, however, does not require equipment to such extent. The appellee testified that on the night in question he tried ten or twelve times, while in the cab, after having emptied the pan, to close it, and says that because of cinders or clinkers or a high pile of ashes he was unable to close it from his position in the cab. · Failing to do so, he intended to get down on the ground and close the ash pan by lifting up the front end of the second rod, stating that he had frequently closed it in this way. He contends, however, that in assuming a position upon the ground which would enable him to so close it he would be partly under the engine. The photographs which are made exhibits to and part of the statement of facts show an employee operating the equipment while standing something over two feet from the rails, although about eighteen inches above his head and extending out five or six inches over that side of his person next to the engine is seen what we take to be an extension of the floor of the cab or outer edge of the running board of the engine. A witness for the appellants testified that he had frequently opened and closed the ash pan while standing upon the ground on the side of the second rod farthest from the engine, and the pictures show an employee operating it in this way. The inevitable conclusion from the evidence upon this point is that, when so working it, the danger to the employee is reduced to a minimum, and it cannot be held, when the law is reasonably construed, that such employee is in any sense required to 'go under' the engine."

[1] It will be seen, therefore, that the companies had equipped this engine in such a way as to permit of the opening and closing of the ash pan in two places, either of which was in compliance with the statute. There is evidence that this equipment would not work on the night in question from the position in the cab. But there is absolutely no evidence in the record denying that it could be worked from the position shown in Exhibits 1 and 2, referred to by the Court of Civil Appeals, and which can be seen at the very end of the statement of facts on file.

Smithers himself testified he did not know whether it could have been worked in that way or not. The company's witness testified it could be worked in that way. So this affirmative testimony, not being contradicted, must stand, even without the necessity on the part of the company of relying upon the legal presumption that the railway company was obeying the statutes in equipping its locomotives. In the absence of any evidence to the contrary, such a presumption does obtain. In the case of Railway Co. v. Beaham, 242 U. S. 148, 37 S. Ct. 43, 61 L. Ed. 210, the Supreme Court says: "And the carrier is entitled to the presumption that its business is being conducted lawfully."

[2] Therefore, as found by the Court of Civil Appeals, it must be held that the ash pan could have been handled by one in the positions shown in Exhibits 1 and 2 heretofore referred to. The question is whether or not the man, as shown in these pictures, had to "go under" the engine to do his work. We shall now take up that question. But, before doing so, it should be said that Smithers says he would not have worked the ash pan in that safe way; that his method would have exposed him to grave danger upon a slight movement by the locomotive while he was at work. But the company is not liable to him, if he selects an unsafe method when a safe one is at hand. This is distinctly held by this section of the Commission of Appeals in the case of Railway Co. v. Graham, 209 S. W. 399.

[3] This case is controlled by the federal decisions; it being a suit under the Federal Employers' Liability Act (U. S. Comp. St. §§ 8657–8665) for an injury sustained in interstate commerce. Referring to various safety appliance acts, the federal courts unanimously hold that they must be construed, interpreted, and applied, "in view of practical railroad operations." See Boehmer v. Railway Co., 252 F. 553, 165 C. C. A. 3; Id., 252 U. S. 496, 40 S. Ct. 409, 64 L. Ed. 680.

[4] The same test should be applied as to this ash pan attachment. As seen by the exhibits mentioned, and as found by the Court of Civil Appeals, this attachment was so constructed that a man could operate it while standing on the ground "something over two feet from the rails, although about eighteen inches above his head and extending out five or six inches over that side of his person next to the engine is seen what we take to be an extension of the floor of the cab or outer edge of the running board of the engine."

Upon this point, the Court of Civil Appeals speaks as follows:

"To require railroad companies to so equip their engines that a party could stand where no part of the top of the engine, regardless of how far it might be above his head, would extend over him, might result in the presence of appliances which would result in great danger,

because of their extension several feet beyond the rails, rendering them menaces to people and to buildings, mail cranes, and other structures near the track."

The attachment shown by the exhibit was consistent with practical railroad operation, and Congress intended nothing more in passing this ash pan act.

Under the old practices, the ash pan was operated by one going between the rails and practically lying down under the engine. In that position, any sudden movement of the locomotive would necessarily kill or seriously injure the employee. The same was true of the old method of coupling box cars. A man was required to go entirely between such cars in performing that kind of task. When the cars came together to be coupled, the least misstep would necessarily crush a man to death. It was to relieve against these extreme dangers that Congress enacted the various safety appliance acts.

In the case at bar, Smithers could easily have saved himself had he been working there and the engine moved. It is practically impossible to work with any machinery and save yourself from all chance of injury, if you do not take advantage of an opportunity to save yourself. It was only that employees might have ample opportunity to do that, that legislation of this kind was enacted. See Candy Co. v. Miller, 160 F. 51, 87 C. C. A. 207.

A decision of the Circuit Court of Appeals last July in the case of Railway Co. v. Jones, 300 F. 525, is authority for the rule that the putting in of an arm or leg to a point within the corner of the car did not violate the automatic coupler act (U. S. Comp. St. §§ 8605–8612). In that case, Justice Denison said:

"Defendant assigns error because the trial judge refused to give instructions defining the statutory phrase 'going between the ends of the cars,' and thus left it open for the jury to say that even the putting in of an arm or leg to the point within the corner of the car, where the outer end of the operating lever is compelled to be, would indicate a violation of the statute. We have no doubt an instruction should have been given to the effect that the statute did not reach that slight degree of 'going between the ends of the cars'; but no harm was done by not giving it. The evidence was undisputed that Jones did put the greater part of his body between the ends of the cars within the rail line, and the verdict of the jury, under the charge as given, must be based upon the theory that this complete movement by Jones underlay the injury."

If a man can insert his arm or leg between the cars in working the coupler device without violating that act, then he can certainly work an ash pan device without violating the statute when he is not under any part of the locomotive except that a

projection of the floor of the cab, eighteen inches above his head, extends a few inches over his hands and body.

We think the Court of Civil Appeals clearly correct in holding that the ash pan device in question was in compliance with the statute. Therefore there can be no liability on the part of the company.

Having held that there was no violation of the ash pan act, it then becomes unnecessary for us to determine whether or not the Court of Civil Appeals was correct in holding that, even if the ash pan law had been violated, there could be no recovery against the railway company, for the reason that such a violation could not be a proximate cause of the injury. Therefore we do not pass upon that question at all.

For the reason discussed by us, we recommend that the judgment of the Court of Civil Appeals be affirmed.

CURETON, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.